# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 03-3777

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOSEPH L. CELLITTI,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for
the Northern District of Illinois, Western Division.
No. 03 CR 50006-1—**Philip G. Reinhard**, *Judge.*

_____

ARGUED MAY 18, 2004—DECIDED OCTOBER 19, 2004

_____

Before FLAUM, *Chief Judge*, and KANNE and ROVNER,
*Circuit Judges*.

ROVNER, *Circuit Judge*. Joseph Cellitti pleaded guilty to
possessing a firearm after sustaining a felony conviction, 18
U.S.C. § 922(g)(1), while reserving the right to challenge on
appeal the district court's denial of his motion to suppress
evidence. We now vacate and remand.

## Background

Police in Rockford, Illinois, received a call in the early
morning hours of August 13, 2002, that a man with a gun

was threatening people on Gilbert Avenue. The first officer to respond, Harold Combs, encountered three people hiding behind a building. One of them, James Singleton, told Officer Combs that he had been walking home when he was confronted by a man later identified as Cellitti. Singleton said that Cellitti had verbally accosted him and then threatened him with a beer bottle. At that point, Singleton told the officer, a white Dodge Neon had turned onto the street and screeched to a halt next to him and Cellitti. A woman, later identified as Cellitti's fiancée, Melissa Bauer ("Melissa"), and her brother, Kevin Bauer ("Kevin"), jumped out of the car; Kevin joined Cellitti in attacking Singleton while Melissa tried to restrain both her brother and fiancé. During the commotion Singleton retreated to his apartment, retrieved a kitchen knife, and returned to the street. But he quickly ran for cover, Singleton continued, when he saw Cellitti exit a nearby house at 2215 Kilburn Avenue carrying an assault rifle that Cellitti loaded and pointed at him. The other two people hiding with Singleton—his fiancée and a neighbor— had also witnessed Cellitti's unprovoked assaults, and they provided Officer Combs with similar accounts.

Officer Combs radioed this information to backup officers, who proceeded to 2215 Kilburn Avenue and entered a breezeway behind the house. The police then shouted for the occupants to come outside. Cellitti, Melissa, Kevin, and two others exited, and the officers handcuffed all of them. After approximately five minutes of calling into the house, officers entered and conducted a protective sweep. They located four additional adults, all of whom they brought outside and handcuffed (there were also two children in the house). The police then lined up the nine adults[1] and brought Singleton over to the group. Singleton immediately identified Cellitti

---

[1]  At one point, Officer Combs testified that nine people exited the house; at another, he testified that there were ten people in the lineup. The discrepancy for our purposes is immaterial.

as the man who had brandished the rifle and Melissa and Kevin as the occupants of the white Neon. The officers then determined that Melissa owned the house—where she lived with Cellitti—and they obtained her consent to search the house for the rifle. The officers failed to locate a gun in the house, but happened upon a set of keys under a cushion on a sofa in the living room. Officer Combs seized the keys and used them to attempt to unlock a white Dodge Neon that was parked in front of the residence. The keys did not fit the Neon or any of several other cars parked near the house.

Officers transported the nine adults to a police station, where Melissa was placed in a holding cell and handcuffed to a bench. The record is silent about what happened to the other occupants of the house once they arrived at the station. Meanwhile, other officers still at the scene located Melissa's maroon Buick automobile parked two blocks from 2215 Kilburn Avenue and discovered that the keys recovered from the house unlocked the car. The officers did not search the car, but instead towed it to an impound lot. Back at the police station, two detectives spoke with Melissa, and she signed a form consenting to a search of the Buick. After she consented to the search, she was promptly released from custody. Approximately six hours had passed from the time the police initially responded to the call until Melissa signed the consent form. Police searched the Buick and found a loaded Sturm Ruger .223 caliber assault rifle in the trunk.

## Discussion

Cellitti acknowledges on appeal that the officers' initial entry into the home was justified by exigent circumstances, *see Michigan v. Tyler*, 436 U.S. 499, 509 (1978), and that their subsequent search of his and Melissa's home was conducted pursuant to Melissa's voluntary consent, *see Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). He

contends, however, that the officers exceeded the scope of the consent to search the house when they seized the keys from under the sofa cushion, and that Melissa's later consent to the search of the Buick was coerced. In reviewing the district court's denial of Cellitti's motion to suppress evidence, we review legal questions de novo and factual questions for clear error. *United States v. Fields*, 371 F.3d 910, 914 (7th Cir. 2004).

At the outset the government contends that Cellitti cannot challenge the consent search of the Buick because it was Melissa, not Cellitti, who gave that consent. *See Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978) (Fourth Amendment rights are personal and may not be asserted vicariously). But this argument misses the mark because the relevant inquiry is whether Cellitti's privacy interests in the Buick were violated by the search, and the government conceded both in the district court and in its brief on appeal that he had a legitimate expectation of privacy in that car. *See id.* at 143 (defendant can claim protection under the Fourth Amendment if he "has a legitimate expectation of privacy in the invaded place"). A third party may give consent to search a place in which both she and the defendant have legitimate expectations of privacy, and the defendant can challenge the validity of the consent given by the third party. *See, e.g.*, *United States v. Matlock*, 415 U.S. 164 (1974) (defendant challenged roommate's consent to search bedroom); *United States v. Basinski*, 226 F.3d 829, 834-36 (7th Cir. 2000) (defendant challenged friend's consent to search defendant's briefcase); *United States v. Jensen*, 169 F.3d 1044, 1048-49 (7th Cir. 1999) (defendant challenged his stepfather's consent to search car he was driving but that his stepfather owned); *United States v. Ladell*, 127 F.3d 622, 624 (7th Cir. 1997) (defendant challenged his mother's consent to search their apartment); *United States v. Saadeh*, 61 F.3d 510, 517-19 (7th Cir. 1995) (defendant challenged consent of the woman who owned garage where he worked to search the garage). That is the situation here. If, as Cellitti contends,

Melissa's constitutional rights were violated in that she was coerced into consenting to a search of the Buick, then Cellitti's rights were likewise violated because he too had an expectation of privacy in the car. He can therefore challenge the voluntariness of her consent.

We turn then to Melissa's consent. Whether she freely and voluntarily consented to the search is a factual question, which we review for clear error. *United States v. Pedroza*, 269 F.3d 821, 826 (7th Cir. 2001). We defer to the district court's determinations of witness credibility, *id.*, and we will not reverse unless we are "left with the definite and firm conviction that a mistake has been made," *United States v. Strache*, 202 F.3d 980, 984-85 (7th Cir. 2000) (internal citation and quotation omitted). The district court correctly recognized that several factors ordinarily are relevant in determining whether consent was given voluntarily, including: (1) the age, intelligence, and education of the person who gave consent, (2) whether she was advised of her constitutional rights, (3) how long she was detained before consenting, (4) whether she consented immediately or only after repeated requests by authorities, (5) whether physical coercion was used, and (6) whether she was in police custody at the time she gave her consent. *Schneckloth*, 412 U.S. at 226; *United States v. Raibley*, 243 F.3d 1069, 1075-76 (7th Cir. 2001). No one factor is dispositive and the determination of voluntariness depends on the totality of the circumstances. *Strache*, 202 F.3d at 985. The district court acknowledged that Melissa was in custody at the time she consented and that she had been detained by the police for approximately six hours, but determined that her consent was nonetheless voluntary because she had not been physically coerced or badgered to consent and, at 23 years of age, was old enough and possessed enough intelligence and maturity to understand the situation.

But there is a flaw in the district court's reasoning because the court failed to consider why Melissa was in custody.

Having been placed in handcuffs, driven to the police station, locked in a holding cell, and chained to a bench for several hours, her encounter with the police had progressed beyond an investigatory detention, *see Terry v. Ohio*, 392 U.S. 1 (1968), and developed into an arrest long before she consented to the search of the Buick. *See Dunaway v. New York*, 442 U.S. 200, 212-13 (1979). But the police had no probable cause to believe that Melissa had committed a crime when they arrested her. *See United States v. Funches*, 327 F.3d 582, 586 (7th Cir. 2003). Indeed the government has never disputed Cellitti's contention that Melissa's arrest was illegal and has never suggested a reason why the officers had probable cause to arrest her. Officer Combs even testified at the suppression hearing that he had no information that Melissa had committed a crime at the time he took her into custody.

Consent given during an illegal detention is presumptively invalid. *See Pedroza*, 269 F.3d at 827; *United States v. Jerez*, 108 F.3d 684, 695 & n.13 (7th Cir. 1997) (there is a "strong body of case law in our circuit, as well as in other circuits" holding that consent is tainted by illegal stops, detentions, or arrests); *United States v. Thompson*, 106 F.3d 794, 797-98 (7th Cir. 1997); *United States v. Novak*, 870 F.2d 1345, 1353 (7th Cir. 1989); *United States v. Sanchez-Jaramillo*, 637 F.2d 1094, 1098-1100 (7th Cir. 1980). Although the consent may nevertheless be valid provided that it is sufficiently attenuated from the illegal police action to dissipate the taint, *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)*; Fields*, 371 F.3d at 915; *see also Thompson*, 106 F.3d at 797-98 (consent given during illegal arrest may be voluntary if it stems from "an independent act of free will"), the government here has not established that Melissa's consent was attenuated from her illegal arrest. In assessing whether the taint of an illegal seizure was dissipated before consent was given, we consider the time that elapsed between the illegal act and the subsequent

acquisition of evidence; the presence of intervening factors; and the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975); *Jerez*, 108 F.3d at 694-95. When consent to search is given by a person who remains illegally detained, the government is unlikely to meet its burden of showing that the consent was sufficiently attenuated from the illegality. *See Jerez*, 108 F.3d at 695; *McGann v. Northeast Ill. Reg'l Commuter R.R. Corp.*, 8 F.3d 1174, 1184 (7th Cir. 1993). Here, Melissa's consent was given while she was still in custody because of the illegal arrest and there was no intervening event of significance. Under these circumstances, we conclude that her consent to search the Buick was tainted by her illegal arrest and was therefore invalid.

Although the search of the Buick cannot be upheld on the basis of Melissa's consent, we must consider whether the officers had an alternative ground to search the car without a search warrant. Several events led to the officers' search of the Buick and we must consider each in turn, beginning with the seizure of the keys. Again, we note that in the district court the government conceded that Cellitti had "standing" to challenge the seizure of the keys, and we accept its concession. The officers seized the keys while they were searching the house for the rifle. When a citizen consents to a search of her property, the police must constrain their search and seizures to the scope of the consent. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). But an officer may nevertheless seize an incriminating item not within the scope of the consent if it is in "plain view." *United States v. Raney*, 342 F.3d 551, 558-59 (7th Cir. 2003). The seizure of an item that falls outside the scope of a consent search is within the plain view exception if: (1) the officer was lawfully present in the place from where he viewed the item, (2) the item was in plain view, and (3) its incriminating nature was "immediately apparent." *Id.* Neither of the first two requirements is in doubt here. Melissa voluntarily

consented to the officers' entry into her home for the purpose of looking for a rifle, which could be hidden under the cushions of a sofa. *See United States v. Ross*, 456 U.S. 798, 820-21 (1982) (search may extend to entire area in which object of search may be found). Once the officers removed the cushions, the keys were in plain view.

What is less clear, however, is whether the incriminating nature of the keys was "immediately apparent." *See Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971). For the incriminating nature to be immediately apparent, the officer must have probable cause to believe that the item is contraband or otherwise linked to criminal activity. *United States v. Bruce*, 109 F.3d 323, 328 (7th Cir. 1997). Although officers may have probable cause to seize an ordinarily innocuous object when the context of an investigation casts that item in a suspicious light, *see United States v. Van Dreel*, 155 F.3d 902, 905 (7th Cir. 1998) (guns and ammunition found during investigation of illegal hunting); *Bruce*, 109 F.3d at 328-29 (shotgun shells found while officers were investigating armed bank robberies); *United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994) (empty ammunition box found in suspected drug dealer's apartment); *United States v. Cervantes*, 19 F.3d 1151, 1153 (7th Cir. 1994) (large amount of cash found on man who had recently sold illegal drugs to an undercover officer), the link between the keys and the criminal activity these officers were investigating is too strained. The officers did not locate a rifle in the house and thought that it was hidden somewhere nearby—perhaps in a car. As it turned out, the officers' instincts were correct. But at the time they located the keys, the police had no information whatsoever tying that lone set of keys found in a house occupied earlier by nine adults to the crime they were investigating. Nothing about the keys suggested that they belonged to any of the three people Singleton said were present during the altercation with Cellitti. Nor did any-

thing link those keys to the Neon—a car that had been involved in the earlier assaults and was parked in front of the house. So far as we can tell from the record, nothing about the keys revealed that they corresponded to a Buick, and in any event there had not been a Buick involved in the morning's altercation, no Buick was parked in front of the house, and the officers had no information that the gun might have been in a Buick. The gun could have been anywhere, and the officers' speculation that it might have been hidden in a car is insufficient to establish probable cause to seize the keys. We thus hold that the seizure of the keys did not fall within the plain view exception, and therefore violated the Fourth Amendment.

The testing of the keys in the lock of the Buick, and the impoundment and warrantless search of the car occurred as a direct result of the officers' illegal seizure of the keys, and thus are fruits of the poisonous tree. *See Fields*, 371 F.3d at 915. The government has not argued that the police inevitably would have discovered the rifle in the Buick through any other means, *see Murray v. United States*, 487 U.S. 533, 539 (1988), and we must therefore conclude that the district court erred when it denied Cellitti's motion to suppress the rifle.

VACATED and REMANDED.

A true Copy:

    Teste:

                            _____
                            *Clerk of the United States Court of*
                            *Appeals for the Seventh Circuit*