# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-2415

JOHN C. BLEAVINS,

*Plaintiff-Appellant,*

v.

JOEL H. BARTELS, ROGER BAY,
VERNON MCGREGOR, et al.,

*Defendants-Appellees.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 98 C 1236—**Michael M. Mihm**, *Judge.*

———————

ARGUED APRIL 6, 2005—DECIDED AUGUST 16, 2005

———————

Before BAUER, RIPPLE and WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* State revenue agents entered property rented by tax debtor John Bleavins and seized several trailers. Mr. Bleavins then filed a civil rights action in state court in which he alleged a violation of his rights under the Fourth Amendment. The defendants removed the case to the district court. The district court ruled for Mr. Bleavins on liability, and he received an award follow-

ing trial on damages. The defendants appealed, and we reversed the district court's judgment. On remand, the district court determined that the defendants had not violated Mr. Bleavins' Fourth Amendment rights and, in the alternative, that the defendants were entitled to qualified immunity. Mr. Bleavins appeals that determination. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I
# BACKGROUND

## A. Facts

We have detailed previously the facts of this case in *Bleavins v. Bartels* ("*Bleavins I*"), 326 F.3d 887 (7th Cir. 2003), and briefly recount them here. In 1995, the State of Illinois determined that Mr. Bleavins owed more than $11,000 in back taxes. The Illinois Department of Revenue ("IDOR") began the process of administrative seizure. *See* 35 ILCS 5/1109. In preparation, IDOR employee Roger Bay surveyed the land surrounding Mr. Bleavins' property in January. During his inspection, Mr. Bay did not enter the property; he used binoculars to observe the site from fifty to seventy yards away. He saw two boats, a pickup truck and two trailers—one flatbed trailer and one that included a container housing Mr. Bleavins' tools (the "tool trailer").[1] Mr. Bay recorded the vehicles' license plate numbers, sketched the site and filled out a seizure checklist, all of which he provided to fellow employee Joel Bartels. In May, Mr. Bartels issued an administrative warrant listing the boats as property to be seized.

---

[1] One of the boats was mounted on a third trailer.

Mr. Bartels, Mr. Bay and co-defendant Vernon McGregor (the "defendants" or the "State"), together with several Macon County Sheriff's deputies, proceeded to Mr. Bleavins' house to execute the warrant. The group entered Mr. Bleavins' property; Mr. McGregor determined that they would not be able to seize the boats without damaging them. Over Mr. Bleavins' objection, Mr. McGregor then directed the deputies to seize instead the flatbed and tool trailers.

Mr. Bleavins later brought an action in state court for the return of his trailers, which had not been described in the warrant. The state court ordered the return of his property. Mr. Bleavins then filed, in state court, a civil rights action against the defendants. He alleged that they had violated his rights under the Fourth and Fourteenth Amendments to the Constitution of the United States.

## B.  District Court Proceedings

The defendants, Mr. Bartels, Mr. Bay and Mr. McGregor, removed the case to the district court. *See* 28 U.S.C. § 1441(a). The district court rejected the defendants' claims of qualified immunity and granted summary judgment to Mr. Bleavins on liability. After a trial on damages, a jury awarded Mr. Bleavins $1,000. The defendants appealed, arguing that the seizure of Mr. Bleavins' trailers did not violate the Fourth Amendment and that the district court had erred in determining that they were not entitled to qualified immunity.

After withdrawing an initial opinion and granting a rehearing, we invited the parties to address two particular issues: (1) whether the warrant at issue was a valid Fourth Amendment warrant and (2) whether the seized trailers were located within the curtilage of Mr. Bleavins' home. The

defendants conceded that the administrative warrant did not meet the requirements of the Fourth Amendment. We therefore noted that, absent a valid warrant, the defendants would have violated the Amendment if Mr. Bleavins had a legitimate privacy interest in the area in which the trailers were seized. *See G.M. Leasing Corp. v. United States*, 429 U.S. 338, 351-52 (1977).[2] In particular, we noted that "if the seized trailers were located within the curtilage of Bleavins' home, appellants' warrantless entry into the area would constitute a violation of Bleavins' Fourth Amendment rights." *Bleavins I*, 326 F.3d at 891.

The parties disputed whether the trailers were within or outside the curtilage of Mr. Bleavins' home. Because the issue potentially impacted both the Fourth Amendment claim and the qualified immunity defense and because the district court had made no factual finding on the issue, we remanded the case to the district court "to consider whether the trailers which were seized were located within the curtilage of Bleavins' home and, if they were, whether appellants could have reasonably believed that the area was not curtilage." *Id.* at 892.

On remand, the parties entered stipulations about the layout of Mr. Bleavins' property and introduced additional evidence, including photos of Mr. Bleavins' property and a sketch of the property as it appeared in 1995. *See* Appendix

---

[2] In *G.M. Leasing Corp. v. United States*, 429 U.S. 338 (1977), the Supreme Court upheld a "warrantless" seizure, one conducted pursuant to an administrative warrant, occurring at places in which there was no expectation of privacy. *Id.* at 351-52. As we noted in *Bleavins I*, the seizure here likewise was warrantless in the Fourth Amendment sense because the IDOR agents were not acting pursuant to a *judicial* warrant. *Bleavins v. Bartels* ("*Bleavins I*"), 326 F.3d 887, 891 n.2 (7th Cir. 2003).

A, *infra*. According to this evidence, Mr. Bleavins' property was bounded to the north by William Street Road and to the south by a creek. Fencing surrounded the property on all four sides. A driveway—the only entrance to the property—extended from north to south, from William Street Road past Mr. Bleavins' home; a sign reading "PRIVATE PROPERTY KEEP OUT" was posted at the driveway entrance. R.136, Ex.OO. South of Mr. Bleavins' residence was a field, and a three- or four-foot-high internal fence separated this field from the rest of the property. It is in this field that Mr. Bleavins stored his trailers, together with the boats and a truck. The trailers were seized from this field. The photos depict the property as it appeared at the time of this action, not as it appeared in 1995. They indicate that the property is surrounded by foliage; Mr. Bleavins concedes that the pictures demonstrate more extensive foliage than existed in 1995, and the parties dispute the extent of tree cover during Mr. Bay's wintertime observation of the field.

The parties filed cross-motions for summary judgment. The district court first considered the curtilage question. It analyzed the south field according to the four factors identified in *United States v. Dunn*, 480 U.S. 294 (1987). Although the field was relatively close to Mr. Bleavins' house and was fenced, the fence's size and construction did not shield items in the field from view. Given the inadequacy of the fence, along with the field's apparent use only for storage and the relatively unimpeded view from the north street into the field, the district court held that the field was not curtilage for purposes of Fourth Amendment privacy considerations.

The district court then determined, in the alternative, that the agents were entitled to qualified immunity. The district court based this conclusion primarily on the apparent non-responsiveness of Mr. Bleavins' submissions. At any rate, it determined that the fact-specific nature of the curtilage

inquiry precluded Mr. Bleavins from meeting his burden under the second element of qualified immunity because it was not clear that a reasonable agent in 1995 would have understood that his conduct constituted a violation.

## II

## DISCUSSION

### A.  Standard of Review[3]

We review the grant of summary judgment de novo, drawing all reasonable inferences in favor of the nonmoving party. *See Lawrence v. Kenosha County*, 391 F.3d 837, 841 (7th Cir. 2004). We apply the same standard in reviewing cross-motions for summary judgment. *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). When the parties stipulate to the material facts and both move for summary judgment we simply review the district court's resulting legal conclusions de novo. *Freedom from Religion Found., Inc. v. City of Marshfield*, 203 F.3d 487, 491 (7th Cir. 2000).[4]

---

[3]  The State raises another threshold matter that need not detain us. The State urges us to strike Mr. Bleavins' brief in its entirety or to affirm summarily the district court. It submits that Mr. Bleavins failed to comply with several procedural rules. *See* Fed. R. App. P. 28(a)(7), (9)(A); 7th Cir. R. App. P. 28(c); *L.S.F. Transp., Inc. v. NLRB*, 282 F.3d 972, 975 n.1 (7th Cir. 2002). Such measures are not appropriate in this case.

[4]  In *Bleavins I*, we noted that the fact-intensive nature of the curtilage inquiry has created division among our sister circuits concerning the standard to apply in reviewing a district court's application of *United States v. Dunn*, 480 U.S. 294 (1987). *See Bleavins I*, 326 F.3d at 891 n.3 (citing *United States v. Breza*, 308

(continued...)

---

4 (...continued)
F.3d 430, 435 (4th Cir. 2002)). As described in *Breza*, in early cases, the courts of appeals for the Third and Tenth Circuits reviewed curtilage determinations for clear error. *See United States v. Benish*, 5 F.3d 20, 23-24 (3d Cir. 1993); *United States v. Swepston*, 987 F.2d 1510, 1513 (10th Cir. 1993). In *Ornelas v. United States*, 517 U.S. 690 (1996), the Supreme Court held that "the ultimate questions of reasonable suspicion and probable cause to make a warrantless search should be reviewed *de novo*," *id.* at 691, although courts of appeals are "to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges," *id.* at 699.

Relying on *Ornelas*, the First, Fourth and Ninth Circuits appear to review the overall curtilage determination de novo. *See Breza*, 308 F.3d at 435; *United States v. Diehl*, 276 F.3d 32, 37-38 (1st Cir. 2002); *United States v. Johnson*, 256 F.3d 895, 912 (9th Cir. 2001) (en banc); *cf. United States v. Redmon*, 138 F.3d 1109, 1132 (7th Cir. 1998) (Posner, C.J., dissenting) ("I take it, in light of *Ornelas v. United States*, that [curtilage] is a question that we are to decide de novo . . . ." (citation omitted)). *But see United States v. Romero-Bustamente*, 337 F.3d 1104, 1107 n.2 (9th Cir. 2003) (noting that there remains some debate on the subject in the Ninth Circuit despite *Johnson*). The First and Fourth Circuits have further clarified that a district court's findings of antecedent fact are reviewed for clear error. *Breza*, 308 F.3d at 435; *Diehl*, 276 F.3d at 38.

*Breza* and the cases that it discusses, all criminal cases, are not applicable to the issue before this court: the proper standard by which to review a district court's curtilage determination in granting summary judgment in a civil case. In *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 597 (6th Cir. 1998), the Sixth Circuit held that, regardless of whether the standard in criminal cases is clear error or de novo with historical facts reviewed for clear error, the court reviews a grant of summary judgment de novo.

(continued...)

## B. Qualified Immunity

We first consider whether the defendants enjoy qualified immunity. *See Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987). This doctrine shields a government actor from further litigation unless the plaintiff can demonstrate (1) "the violation of a constitutional right" that is (2) "clearly established at the time of the violation, so that a reasonable public official would have known that his conduct was unlawful." *Sonnleitner v. York*, 304 F.3d 704, 716 (7th Cir. 2002); *see Saucier v. Katz*, 533 U.S. 194, 200-02 (2001). As often occurs in these cases, our inquiry into the first prong of the qualified immunity paradigm requires that we assess the constitutional issue at the heart of the plaintiff's case. *See Allison v. Snyder*, 332 F.3d 1076, 1078 (7th Cir. 2003).

### 1.

The Fourth Amendment, applied to the States by the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643 (1961), provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated," U.S. Const. amend. IV. In *Katz v. United States*, 389 U.S. 347 (1967), and its progeny, the Supreme Court "rejected a property-line approach to the Fourth Amendment." *Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir. 2001). The "touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).

Nevertheless, a property-based concept—curtilage—remains important in evaluating privacy interests. *See*

---

[4] (...continued)
We agree.

*United States v. Hedrick*, 922 F.2d 396, 399 (7th Cir. 1991) ("[T]he Supreme Court continues to discuss the protection accorded the curtilage even though it has rejected the notion that property law defines the contours of Fourth Amendment protection."). The importance of curtilage stems from the particularly important protections that the Fourth Amendment affords to homes:

> "At the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman* v. *United States*, 365 U.S. 505, 511 (1961). With few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no. See *Illinois* v. *Rodriguez*, 497 U.S. 177, 181 (1990); *Payton* v. *New York*, 445 U.S. 573, 586 (1980).

*Kyllo v. United States*, 533 U.S. 27, 31 (2001). This constitutional protection is not limited to the residence structure: "Both a home and the home's curtilage—i.e., the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home—are within the scope of the Fourth Amendment's protection." *Siebert*, 256 F.3d at 653-54 (internal quotation marks and citations omitted); *see also Oliver v. United States*, 466 U.S. 170, 182 n.12 (1984) ("[T]he conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience.").[5] A warrantless search of a

---

[5] *See generally* 1 Wayne R. LaFave, Search and Seizure § 2.3(d), at 587-90 (4th ed. 2004) (describing the continued vitality of the
(continued...)

home's curtilage implicates the "very core" of the Fourth Amendment and presumptively is unreasonable. *See Payton*, 445 U.S. at 585-86; *Leaf v. Shelnutt*, 400 F.3d 1070, 1081 (7th Cir. 2005); *Hedrick*, 922 F.2d at 399 (describing curtilage as the area "in which privacy expectations are most heightened").

These considerations prompted us to remand this case to the district court to determine whether the field in which Mr. Bleavins stored his seized trailers constituted the curtilage of his home. The Supreme Court addressed the standard for this determination in *Dunn*. It identified four factors to consider: (1) the proximity of the area in question to the home; (2) whether the area is included in an enclosure surrounding the home; (3) how the owner uses the area; and (4) the measures taken to protect the area from observation. *Dunn*, 480 U.S. at 301. We shall discuss each of these factors.

**a.**

*Dunn* first requires us to consider the proximity of the field to Mr. Bleavins' residence. The stipulated diagram, which does not appear to be drawn to scale, indicates that Mr. Bleavins' house generally occupies the northwest corner of the property, and the field generally encompasses the southern half. A notation describes the span of Mr. Bleavins'

---

[5] (...continued)
curtilage concept); Brendan Peters, Note, *Fourth Amendment Yard Work: Curtilage's Mow-Line Rule*, 56 Stan. L. Rev. 943, 952-62 (2004) (tracing the common law and modern importance of curtilage); S. Bryan Lawrence III, Comment, *Curtilage or Open Fields?*: Oliver v. United States *Gives Renewed Significance to the Concept of Curtilage in Fourth Amendment Analysis*, 46 U. Pitt. L. Rev. 795 (1985).

property, from north to south, as approximately 200 feet. We know that the south field is less than 200 feet from the home and that the shop tool shed lies between the home and the field, but we cannot determine the actual distance between the field and Mr. Bleavins' residence. Mr. Bleavins claimed before the district court that the south field is seventy-five feet from the home but, as the district court noted, there is no other evidence in the record to confirm his assertion.

We have, at any rate, resisted over-reliance on the proximity prong of *Dunn*, standing alone. Attempts to establish bright-line distance tests with respect to this prong are an exercise in futility. This first *Dunn* factor tends to be very case-specific, and its significance is highly dependent on other factors.[6] "While it is true that we have found that privacy expectations are most heightened when the area in question is near[ ] (within 20 feet) to the home, the proximity to the home, standing by itself, does not *per se*, suffice to establish an area as within the curtilage." *United States v. French*, 291 F.3d 945, 952 (7th Cir. 2002). On the state of the record, we cannot determine with any certainty the proximity of the field to Mr. Bleavins' home and thus turn to consideration of the other *Dunn* factors. *See United States v. Gerard*, 362 F.3d 484, 487 (6th Cir. 2004) ("Neither party included in its brief the proximity of the garage to the farm house. . . . The distance alone, however, is not determinative that the garage should be treated as an adjunct of the house.").

---

[6] For example, based on other factors, the Second Circuit has found an area located 375 feet from a residence to be included in the curtilage. *United States v. Reilly*, 76 F.3d 1271 (2d Cir. 1996).

**b.**

We next consider whether the south field is located in an enclosure surrounding the home. Mr. Bleavins points out that the south field is enclosed by the fence surrounding his entire property, an enclosure that includes his home. The State notes, however, that the field is further separated from the home by an internal fence and thus is contained in an enclosure separate from that of the residence.

There is no bright-line rule to assess the significance of external and internal fencing; the Supreme Court in *Dunn* pointedly rejected an argument that a home's curtilage "should extend no farther than the nearest fence surrounding a fenced house." *Dunn*, 480 U.S. at 301 n.4 (internal quotation marks and citation omitted). Instead, it adopted the four-factor balancing test. Nevertheless, "[f]encing considerations are important factors in defining the curtilage." *Id.*

Mr. Bleavins' property is surrounded by a single enclosure, but interior fencing further demarcates areas within the property. For example, it appears that the area south of Mr. Bleavins' garage is separately demarcated. More importantly, a gated fence separates the south field from the area containing Mr. Bleavins' home, shop tool shed and garage. "Typically, the enclosure factor weighs against those who claim infringement of the curtilage when their land is divided into separate parts by internal fencing." *United States v. Reilly*, 76 F.3d 1271, 1278 (2d Cir. 1996). In this case, the internal fence "serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house," *Dunn*, 480 U.S. at 302, that is, the area containing the home, garage and shop tool shed. Areas outside of this demarcation, including the south field, are not within the "enclosure" surrounding the home. *See Gerard*, 362 F.3d at 488; *United States v. Breza*, 308 F.3d 430,

436 (4th Cir. 2002); *United States v. Johnson*, 256 F.3d 895, 917 (9th Cir. 2001) (en banc). The interior fence separating the south field from Mr. Bleavins' living area thus indicates strongly that the field is not part of the curtilage.

c.

We next consider how Mr. Bleavins used the field; curtilage is afforded special protection only because it is an area "so close to and intimately connected with the home and the activities that normally go on there." *Siebert*, 256 F.3d at 654.

Areas that are "intimately connected with the . . . activities" of the home include, for example, backyards. *See French*, 291 F.3d at 953; *Hedrick*, 922 F.2d at 399; *see also United States v. Carter*, 360 F.3d 1235, 1241 (10th Cir. 2004). Mr. Bleavins does not argue that the south field is a backyard, and it is apparent that Mr. Bleavins primarily used the south field for parking and storage. These uses were related both to Mr. Bleavins' leisure activities (storing his pontoon boat) and to his work-related activities (storing his tool trailer), but none of these uses are intimately associated with the home. *See, e.g.*, *Palmieri v. Lynch*, 392 F.3d 73, 93 & n.14 (2d Cir. 2003) (finding an area to be curtilage because, among other things, it was strewn with children's toys and "other items of a domestic nature"). This conclusion is bolstered by the fact that Mr. Bleavins' property contains a separate garage that is included in the enclosure surrounding his home, presumably intended for parking and storage activities of a domestic nature.

d.

Finally, *Dunn* instructs us to consider whether the south field was visible to passers-by and the measures that Mr. Bleavins took to shield it from view.

We begin with the uncontested facts. Mr. Bleavins does not dispute that Mr. Bay was able to view the lot from a public vantage point, William Street Road, by looking south through his property and that the agent could identify license plate numbers on vehicles parked in the field. Apart from a "Private Property" sign, which does nothing to prevent observation, there is no gate or other obstruction that would prevent an individual in a public area from looking across Mr. Bleavins' driveway and viewing the south field. The interior fence demarcating the south field is chain link, only three to four feet high, and thus presents no barrier to observation. The fence enclosing the entirety of Mr. Bleavins' property is four feet high, at various places composed of "woven wire," "chain link" or "single strand . . . horse fence," R.139 ¶ 2, and by itself does not impede observation. The southernmost border of Mr. Bleavins' land was demarcated by a creek. In 1995, an observer could only view the field from the west by entering a neighbor's property and from the east by entering a fenced pasture that Mr. Bleavins rented for his horse. The parties further agree that trees and shrubbery surround Mr. Bleavins' property, and photographs entered on stipulation by the parties indicate that foliage all but obscures the property from view. However, they dispute the amount of cover that existed in 1995. Mr. Bay submitted an affidavit stating that the photos did not accurately depict the property as it existed in 1995. In particular, he noted that the photos were taken in the summer or early fall, but, during his wintertime observation in 1995, there virtually was no foliage on the trees and shrubs. Mr. Bleavins stated that the photos were an accurate depiction of the property but admitted that, in the eight years between the seizure and the

time of the photos, the tree cover had grown from eight to fourteen feet high. Mr. Bleavins' concession prompted the district court to remark: "With all due respect, six feet of growth is not insubstantial." R.147 at 7. Moreover, the court noted that Mr. Bleavins' submissions were "careful not to address what was actually visible when Bay inventoried the property." *Id.* The district court thus largely accepted that there was little foliage in the winter of 1995 and determined that the fourth *Dunn* factor weighed in favor of finding that the field was not within Mr. Bleavins' curtilage.

We agree with the district court. Mr. Bleavins dedicated a substantial portion of his motion for summary judgment to describing the enclosures surrounding his home and the field. However, whether the fences were "woven wire," "chain link" or "single strand," they were approximately four feet high and, by themselves, presented no barrier to observation. *See United States v. Tolar*, 268 F.3d 530, 532 (7th Cir. 2001) ("[A] chain-link fence does little to assert a privacy interest (as opposed to a property interest) in details visible from outside the fence."). The only fact bearing on the question of whether Mr. Bleavins took steps to shield the field from view was the amount of foliage that existed in 1995.

In accordance with local rules, the defendants noted, in the "Material Facts Claimed to be Disputed" section of their response to his summary judgment motion, that they disputed an "assertion that the property was virtually hidden from anyone looking at the property." R.143 at 2; *see also* C.D. Ill. Local Rule 7.1(D)(2)(b)(2). Mr. Bleavins' reply, *see* C.D. Ill. Local Rule 7.1(D)(3), acknowledged the dispute but failed to offer any evidence that would contradict Mr. Bay's characterization of the foliage, *see id.* 7.1(D)(3)(a)(2). In the course of filing cross-motions, Mr. Bleavins offered only the following information to supplement the photographs:

While the trees and shrubs of plaintiffs property have naturally grown over the years, some of the trees and some of the shrubbery have been trimmed or removed so that basically the property appears substantially the same as it did in 1995, except that the shrubbery along the northern boundary of the property was approximately 8 feet high in 1995, such is now approximately 14 feet high.

R.139 ¶ 16. Moreover, Mr. Bleavins offered no answer to Mr. Bay's characterization of the foliage in winter 1995 in his response to the defendants' motion for summary judgment, noting only that the facts were "in dispute." R.144 at 2. As the district court noted, Mr. Bleavins was "careful not to address what was actually visible when Bay inventoried the property in 1995 or how these changes have modified the visibility of the storage area" and made no effort to rebut Mr. Bay's characterization. R.147 at 7. Notably, in this court Mr. Bleavins does not respond to the argument, but describes the foliage as it appears today and focuses on the fact that he posted a "Private Property" sign at the driveway.

We, like the district court, deem Mr. Bleavins' failure to respond more specifically to Mr. Bay's characterization of the foliage cover as an admission. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921-22 (7th Cir. 1994); C.D. Ill. Local Rule 7.1(D). The record supports the conclusion that Mr. Bleavins took little or no action to shield the south field from view by individuals on William Street Road: The foliage surrounding his property provided little cover and his use of short wire fencing manifested a property interest but not a privacy interest.

Mr. Bleavins submits that we should consider that entry to the field could only be accomplished through a driveway

that does pass through his curtilage[7] and that he manifested an expectation of privacy by posting a "Private Property" sign. We cannot accept this argument. Generally, there is no expectation of privacy in a driveway, particularly where, as here, it is open to observation and use by the public. *See United States v. Evans*, 27 F.3d 1219, 1229 (7th Cir. 1994). Although Mr. Bleavins posted a "Private Property" sign, we have made clear that the important inquiry is whether the public has *access* to a private driveway. A gate may manifest an expectation of privacy because it prevents access to a driveway by the public; a sign alone does not. *See French*, 291 F.3d at 953-54. "The route which any visitor to a residence would use is not private in the Fourth Amendment sense . . . ." 1 Wayne R. LaFave, Search and Seizure § 2.3(e), at 592-93 (4th ed. 2004); *see United States v. Reyes*, 283 F.3d 446, 465-66 (2d Cir. 2002) (collecting cases).

### e.

The *Dunn* factors thus weigh in favor of a determination that Mr. Bleavins' south field is not curtilage. The ultimate inquiry is "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301. Because it was separated from the living area, used for nonresidential purposes and open to the public both to observe and to access, Mr. Bleavins had no expectation of privacy in the south field that society would recog-

---

[7] We assume this assertion to be correct. The stipulated sketch indicates that, in 1995, another gate opened to the field from the south fence line. However, use of this gate apparently would have required the agents to cross a creek and a pasture before they reached the fence line.

nize as reasonable. The search at issue here did not implicate Mr. Bleavins' Fourth Amendment rights.

## 2.

If the plaintiff fails to meet the first prong of the qualified immunity test, that is, fails to demonstrate that were the allegations established the officials would have violated a constitutional right, there is no need to consider the second prong. *Saucier*, 533 U.S. at 201. We conclude that the record makes clear that Mr. Bleavins had no reasonable expectation of privacy in the south field. He thus cannot demonstrate the violation of a constitutional right. We need go no further.

## Conclusion

The defendants were entitled to qualified immunity because Mr. Bleavins failed to establish a constitutional violation. We therefore affirm the judgment of the district court.

AFFIRMED



**Appendix A**

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*