> NONPRECEDENTIAL DISPOSITION
> To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 3, 2018
Decided March 20, 2019

**Before**

DANIEL A. MANION, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

MICHAEL B. BRENNAN, *Circuit Judge*

No. 18-1001

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | Appeal from the United States District Court for the Northern District of Illinois, Western Division. |
| *v.* | No. 3:16CR50038 |
| CONSTANCIO PALOMINO-CHAVEZ, *Defendant-Appellant*. | Philip G. Reinhard, *Judge*. |

**O R D E R**

Constancio Palomino-Chavez has appealed the district court's denial of his motion to suppress cocaine found in a shed in his backyard. This case raises numerous issues, but we need address only two: the legality of the stop and frisk of Palomino-Chavez under *Terry v. Ohio*, 392 U.S. 1 (1968), and the effect that police interaction had on his later consent to search his property. Because we conclude that the stop and frisk was illegal, and that illegality tainted Palomino-Chavez's consent, we vacate the district court's judgment and remand for further proceedings.

# I. Background

## A. *Factual*[1]

On June 28, 2016, around 10:00 a.m., an officer with the Illinois State Police Narcotics and Currency Interdiction Task Force spotted a "vehicle of interest" at a hotel complex in Bedford Park, Illinois, near Midway Airport. The vehicle's registered owner had a criminal record and a pending charge for narcotics trafficking. Concluding that mobile surveillance of the van might lead to evidence of a crime, the officer called for assistance. Approximately ten officers joined in the surveillance, communicating by radio as they tracked the van and its two occupants. Around 6:00 p.m., they followed it to a strip mall parking lot in Rockford, Illinois, where it picked up a third passenger, later identified as defendant Constancio Palomino-Chavez.

At about 6:30 p.m., the van arrived at a house in Rockford; the driver backed it into a one-car standalone garage at the far end of the driveway, adjacent to a shed. During the ensuing surveillance of the home, a few officers drove by the house "to see if they could get a little bit more visual." Officers would occasionally call out by radio that they had "seen a person here or there, but nothing specific." They relayed that the garage door was partially shut on the van's hood, leaving only the front of the vehicle visible from the street. The officers also reported seeing feet and "some movement" on the passenger side of the van and "some interaction" among its occupants.

The van drove off around 7:00 p.m., and a few officers followed it to continue surveillance. Meanwhile, Officers Martorano, Wherry, Guzman, and Kaspar were assigned to approach the house. As Wherry later testified at a suppression hearing, he and Martorano arrived first and "began a cursory search around the property." Wearing their police badges, ballistic vests, and holstered but visible weapons, the officers walked down the driveway and then rounded the back corner of the house. According to Wherry, the officers were trying to speak with "anybody outside on the property before [they] went to knock on the door," citing safety reasons.

From "more so towards the end of the driveway," the officers saw Palomino-Chavez lying in a hammock in the backyard. As Wherry testified, "I was shocked for a second to see him…. He was just as shocked to see me as I was him." From the

---

[1] The facts of this case are more detailed than described in this section. We have included only those necessary for resolution of this appeal.

driveway, Wherry called out "police," raised his badge, and motioned Palomino-Chavez over. Palomino-Chavez walked over to join the officers on the driveway.

Wherry then asked him, in English, whether anyone else was on the property. When Palomino-Chavez responded in Spanish, Wherry motioned for Guzman, who is fluent in Spanish, to take over the conversation. Before further discussion, however, Guzman conducted a quick pat-down of Palomino-Chavez to search for weapons, which he later testified was done "for officer safety purposes." Guzman felt objects on Palomino-Chavez's body and asked what they were; Palomino-Chavez responded that he had phones and a wallet. Guzman instructed him to take those items out of his pockets, which he did.

After informing Palomino-Chavez that the officers were conducting a narcotics investigation, Guzman asked him if the officers could search the property for other people. Palomino-Chavez said "yes," and the officers spent less than a minute looking in the home, garage, and shed, finding no one. Following the protective sweep, Kaspar joined Guzman and Palomino-Chavez on the driveway.

The officers wanted to search the premises "to make sure that there [was] nothing illegal going on," but they did not have a warrant. So Officer Graham (who had recently arrived on the scene) retrieved a Spanish-language consent form from his car. Guzman presented the form to Palomino-Chavez, and then asked him, still in Spanish, for his consent "to search the property and everything that was on the property."

Palomino-Chavez spent several minutes reviewing the consent form and discussing it with Guzman; the district court later found that their conversation lasted "approximately five minutes." Guzman testified that during the conversation he asked a few simple questions, such as who else lived in the home, and that some of Palomino-Chavez's answers "seemed to not make sense." To the officers, Palomino-Chavez appeared nervous and evasive, but the conversation was generally calm.[2] During this time, the officers did not physically restrain Palomino-Chavez or repeatedly ask him to sign the consent form. However, Guzman testified that he asked for permission to

---

[2] Guzman testified that the interaction was "contentious" because Palomino-Chavez appeared "nervous." But the district court credited Kaspar's testimony that the interaction was conversational and not argumentative. Kaspar also testified that Palomino-Chavez nodded or gestured understanding during the conversation about the form, and later asked at least one question in Spanish (unspecified in the record).

search the house "a number of times" before Palomino-Chavez signed the form.[3] After reviewing and discussing the form—which expressly states consent may be refused—Palomino-Chavez signed it. During the ensuing search, the officers found five kilograms of cocaine under the floorboards of a shed next to the garage.

## B. *Procedural*

After Palomino-Chavez was charged with possessing the cocaine with the intent to distribute it, *see* 21 U.S.C. § 841(a)(1), he moved to suppress the drugs as illegally obtained. In his motion, he raised a number of arguments, including a challenge to the voluntariness of his consent to the search of his property. At a hearing on the suppression motion in May 2017, Officers Wherry, Guzman, and Kaspar testified to the events described above. Palomino-Chavez did not testify, but he attached an affidavit to his amended motion to suppress disputing some of the events as described.

The district court concluded that the officers did not violate the Fourth Amendment and denied the motion to suppress. As part of its ruling, the court determined that the officers' entry onto the driveway was permissible and that Palomino-Chavez was not seized when he gave his consent.

Relevant to the seizure issue, the district court made the following factual findings regarding the initial interaction between the officers and Palomino-Chavez:

> The officers walked up the driveway to the residence, which was unobstructed by any gate or other barrier and exposed to the public road as testified to and [as] shown by photographs. They observed defendant in a hammock in his backyard and called out to him, announcing that they were police officers. Defendant walked over to the driveway and spoke to the officers. After observing that defendant spoke broken English, one of the officers present, David Guzman, spoke to him in Spanish. Officer Guzman

---

[3] The district court "credit[ed] the officers' testimony that they did not need to repeatedly ask [Palomino-Chavez] to consent to a search and sign the form." But the transcript supports only the latter assertion that the officers did not repeatedly ask for Palomino-Chavez's signature. In light of Guzman's testimony, the district court's finding that the officers did not repeatedly ask for consent to a *search* is clearly erroneous. *See United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948) (defining clear-error standard); *Madden v. U.S. Dep't of Veterans Affairs*, 873 F.3d 971, 973 (7th Cir. 2017).

first asked whether defendant would consent to a brief protective sweep of the area to ensure officer safety, to which defendant agreed.

It further noted—in its only reference to the pat-down—that "[a]s part of the sweep, Officer Guzman asked defendant to take his phones out and put them to the side, which defendant agreed to do." In making these findings, the court relied heavily on the officers' testimony at the suppression hearing, which it found to be "substantially credible in all respects, even in those instances where their testimony conflicts with [Palomino-Chavez's] affidavit."

The district court concluded that Palomino-Chavez had not been seized, reasoning that "the evidence does not suggest that a reasonable person in defendant's position would feel that he was not free to leave during his conversation with the officers or during the search." But, the court continued, even if a *Terry* stop had occurred, the stop was lawful; the court remarked that "the officers testified sufficiently for the court to credit their determination that they had reasonable suspicion to suspect [the] defendant was involved with an illegal narcotics operation." The district court thus did not address whether the stop tainted Palomino-Chavez's later consent to the search. But it went on to find that his consent to the search was voluntary and that the scope of the consent included the shed.

Following the district court's denial of his motion to suppress, Palomino-Chavez entered a conditional guilty plea, reserving the right to appeal that denial. He was later sentenced to 63 months in prison.

## II. Discussion

On appeal, Palomino-Chavez raises several challenges to the district court's ruling, but we need address only one: the voluntariness of his consent to the search of his property.[4] Palomino-Chavez argues that the officers illegally seized him in violation

---

[4] The parties extensively briefed, and we have considered in great depth, a variety of other contested issues in this case, including whether the parties' interaction on the driveway occurred inside or outside the house's curtilage, and whether the scope of any consent granted included the shed where the officers found the cocaine. Regardless how we decide these other issues, however, the legality of the stop and frisk, and its impact on the defendant's consent, is dispositive. Because we reverse the district court's denial of Palomino-Chavez's motion to suppress on this ground, we need not

of *Terry v. Ohio*, 392 U.S. 1 (1968), and that this illegality tainted his later consent to search the property, which led the officers to the cocaine. The government responds that the interaction between the officers and the defendant was consensual (and thus no seizure occurred), and that Palomino-Chavez's consent to search was voluntary.

In reviewing the district court's denial of a motion to suppress, we defer to the court's credibility determinations and factual findings, unless they are clearly erroneous. *See United States v. Raibley*, 243 F.3d 1069, 1073 (7th Cir. 2001). Even so, "the ultimate determination of whether the authorities violated the defendant's Fourth Amendment rights is one that we review de novo." *Id.*

### A. *Seizure*

We must first determine whether Palomino-Chavez was "seized" under the Fourth Amendment. A seizure occurs when, considering all of the circumstances, a reasonable person would not feel free to leave, decline the officers' requests, or otherwise terminate the encounter. *See Florida v. Bostick*, 501 U.S. 429, 436, 439 (1991). In *United States v. Mendenhall*, 446 U.S. 544 (1980), the Supreme Court applied a multi-factor test to determine if police interaction overcame an individual's free will, resulting in a seizure. Relevant factors include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id*. at 554. We have also considered whether the officers made statements "intimating that he or she was a suspect of a crime," or "informed the suspect that he or she was free to leave." *United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015) (internal citations omitted).

Here, the majority of these factors were present: at least four officers initially approached down the private driveway, with more joining later; they wore ballistic vests and their holstered weapons were visible; Guzman physically touched Palomino-Chavez during the pat-down and then told him that the officers were investigating narcotics trafficking; and no officer informed Palomino-Chavez that he was free to leave. From these facts, we conclude that Palomino-Chavez was seized, as no reasonable person in his position would believe that he was free to disregard the officers and "go on his way." *Florida v. Royer*, 460 U.S. 491, 498 (1983).

---

and do not reach his other arguments. *See, e.g.*, *United States v. Rea-Beltran*, 457 F.3d 695, 700 (7th Cir. 2006).

### B. Terry *Stop and Frisk*

Having determined the officers seized Palomino-Chavez, we turn to whether that seizure was lawful. In order to temporarily detain an individual under *Terry*, the officers must have "specific and articulable facts sufficient to give rise to a reasonable suspicion that a person has committed or is committing a crime." *United States v. Shields*, 789 F.3d 733, 743 (7th Cir. 2015) (quoting *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990)); *see also Terry v. Ohio*, 392 U.S. 1, 22 (1968) ("This demand for specificity in the information upon which police action is predicated is the central teaching of this Court's Fourth Amendment jurisprudence."). The facts in this case do not support such a finding. Our review of the record yielded the following information about the officers' approach of Palomino-Chavez:

- they had spent several hours tailing a van because the vehicle's registered owner had past and pending drug-trafficking charges;
- Palomino-Chavez entered the van at a strip mall in Rockford;
- the van backed into the garage at a house in Rockford;
- the garage door partially closed on the van, but the officers were able to see feet moving around in the garage and "some interaction";
- the van drove off;
- the officers approached;
- Palomino-Chavez was found in the backyard lying in a hammock.

Even in combination, these facts do not amount to reasonable suspicion that Palomino-Chavez himself had committed, or was about to commit, a crime, and the record reveals no other facts to support such suspicion. The district court conclusion to the contrary is not supported by the record.

Moreover, even if we were to conclude that the encounter began consensually, it ceased to be so when Guzman patted down Palomino-Chavez. *See United States v. Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001) (unjustified pat-down may constitute illegal seizure). "The authority to frisk is not automatic in a drug investigation." *United States v. Lopez*, 907 F.3d 472, 485 (7th Cir. 2018). Rather, a pat-down is appropriate "only if the agents have at a minimum some articulable suspicion that the subject is concealing a weapon or poses a danger to the agents or others." *Pedroza*, 269 F.3d at 827; *see also Terry*, 392 U.S. at 30. "This more specific analysis, requiring the officer to hold a reasonable suspicion that the subject is 'armed and dangerous' as opposed to being

generally suspicious, allows courts to distinguish between legitimate and illegitimate frisks, the latter of which constitute severe intrusions upon individual liberty." *United States v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013).

We cannot conclude, on this record, that the officers had the requisite individualized suspicion that Palomino-Chavez was armed or posed a threat. Although factual findings are reviewed for clear error, the district court did not make any findings about, or even mention, the frisk, and the issue was barely discussed at the suppression hearing. Riding in a van with a suspected drug trafficker is not enough to assume someone has a gun. And when the officers first approached, Palomino-Chavez was lying in a hammock in his backyard—hardly a threatening pose. Although the officers described Palomino-Chavez as "nervous" during his conversation with Guzman, nothing in the record indicates his behavior was at all threatening or suggestive of danger.

For these reasons, we conclude the police did not have reasonable suspicion to stop or frisk Palomino-Chavez, and thus, the officers' seizure of him was unlawful.

### C. *Voluntariness of Consent*

Our conclusion that Palomino-Chavez was illegally seized leads us to the next inquiry: did the unlawful stop and frisk taint Palomino-Chavez's later consent to the search of his property, which led the officers to the cocaine? Generally, the illegal seizure of a suspect "will vitiate the suspect's subsequent consent to a search unless the state proves that the consent 'resulted from an independent act of free will.'" *Pedroza*, 269 F.3d at 827 (quoting *United States v. Thompson*, 106 F.3d 794, 797–98 (7th Cir. 1997)); *see also Wong Sun v. United States*, 371 U.S. 471, 488 (1963). In determining whether the government has met its "heavy burden" of proving that the consent has been "purged of the taint of an antecedent illegal seizure," *see United States v. Jerez*, 108 F.3d 684, 695 (7th Cir. 1997), we consider: (1) the lapse of time between the illegality and the defendant's consent; (2) any intervening factors between the two events; and (3) the "purpose and flagrancy of the official misconduct." *United States v. Cellitti*, 387 F.3d 618, 623 (7th Cir. 2004) (citing *Brown v. Illinois*, 422 U.S. 59, 603–04 (1975)).

Here, the first two factors are dispositive. We have already determined Palomino-Chavez was illegally seized. That illegality was "ongoing" when he gave his consent, thus "foreclosing the possibility that the consent was sufficiently attenuated from the unlawful conduct as to purge the taint." *United States v. Johnson*, 427 F.3d 1053, 1057 (7th Cir. 2005); *see also McGann v. Northeast Ill. Reg. Commuter RR Corp.*, 8 F.3d 1174,

1184 (7th Cir. 1993) ("When statements and conduct evidencing consent to a search are given contemporaneously with the illegal seizure, with no break in the causal chain, the actions of the person seized are not free from the taint of the unlawful detention and are thus insufficient to show consent.").

Also, there were no intervening circumstances that would have eliminated the taint of the illegal seizure. The record shows a single episode leading up to Palomino-Chavez giving his consent, beginning with the police ordering him to approach them on the driveway and ending with his signature on the consent form. Nothing that occurred in between those events—a brief protective sweep, a nonconsensual frisk, and a short discussion with Guzman about the form—amounts to an intervening circumstance. The sweep and pat-down likely only "contributed to the coercive setting," *Lopez*, 907 F.3d at 486 n.1, and the conversation with Guzman was not independent from Palomino-Chavez's consent; rather, it was the means through which the officers obtained it. *See Jerez*, 108 F.3d at 695 (holding illegal seizure vitiated defendant's consent because "a short conversation was all that occurred between the two events, and that short conversation was part of the 'res gestae' of obtaining the consent to search").

Here, an illegal stop and frisk occurred before Palomino-Chavez consented to the search, and two of the relevant factors dictate that his consent had not been sufficiently purged of the taint. (As to the third factor, the record shows no flagrant police misconduct occurred.) So the government has not borne its burden of proving that Palomino-Chavez's consent to search was voluntary, and therefore, the evidence found pursuant to that search must be suppressed.

## III. Conclusion

Because the officers lacked reasonable suspicion that Palomino-Chavez had engaged in or was about to engage in criminal activity, or that he was armed and dangerous, the stop and frisk was illegal. That illegality did not dissipate by the time the officers asked for and he gave his consent to search the property. Accordingly, the evidence found pursuant to that search must be suppressed. We therefore REVERSE the district court's decision denying Palomino-Chavez's motion to suppress, VACATE the judgment, and REMAND for further proceedings.

HAMILTON, *Circuit Judge*, concurring. I join the court's order reversing the denial of Palomino-Chavez's motion to suppress. He was stopped and then frisked without reasonable suspicion. That unlawful seizure tainted his consent to search his home. The court's reasoning would apply if the officers had stopped and frisked Palomino-Chavez on a public sidewalk across the street from his home and then obtained his consent to search the property.

In my view, Palomino-Chavez has made an even stronger case for violation of his Fourth Amendment rights based on an issue that the court's order does not reach. The officers entered what lawyers and judges like to call "curtilage"—in this case, his backyard and driveway. Their purpose was to search for evidence. In that private space, the officers first seized and frisked him and then obtained his (involuntary) consent to search. Under both *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018), and *Florida v. Jardines*, 569 U.S. 1, 6 (2013), this intrusion to search the property violated the Fourth Amendment. See also *United States v. Jones*, 565 U.S. 400, 408 n.5 (2012) (trespass alone does not violate the Fourth Amendment, but trespass joined with an attempt to find something or to obtain information violates Fourth Amendment).

In the course of a drug-trafficking investigation, officers tailed a van to Palomino-Chavez's home. Other officers on the surveillance team saw the van back into Palomino-Chavez's driveway, which ran past the side of the home to the back of the property. Officers approached the house but made a beeline for the rear of the property where the van had just been parked in a garage. They walked straight up the driveway, bypassing the home's front and side doors. Upon reaching the rear portion of the driveway, the officers saw Palomino-Chavez relaxing in a hammock in his backyard. One officer testified that he was "shocked for a second" to happen upon anyone during the intrusion. The officers, in tactical gear and armed, of course, signaled Palomino-Chavez to come over to where they stood in his driveway. They frisked him and confiscated his cellphones. They then performed a protective sweep of the property. The officers did not ask a single investigative question or explain their presence or behavior to Palomino-Chavez. Within the next few minutes, they requested and eventually obtained his consent to search his property.

The officers did not have probable cause or even reasonable suspicion to support a *Terry* stop and frisk of Palomino-Chavez. The government has not argued otherwise. The officers were still free to investigate using methods that would not violate Palomino-Chavez's privacy and property rights, such as a voluntary knock-and-talk at

his front door. When police officers walk to a home's front entrance, they do not trespass or violate anyone's Fourth Amendment rights. As the Supreme Court explained in *Jardines*:

> "A license may be implied from the habits of the country," notwithstanding the "strict rule of the English common law as to entry upon a close." *McKee v. Gratz*, 260 U.S. 127, 136 (1922) (Holmes, J.). We have accordingly recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Breard v. Alexandria*, 341 U.S. 622, 626 (1951). This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." *Kentucky v. King*, [563 U.S. 452, 469 (2011)].

569 U.S. at 8.

What happened in *Jardines* (bringing a trained drug-sniffing dog to the front door) went beyond what is permitted by that license implied from social custom. What happened here went even further, making for an even clearer violation of the Fourth Amendment. The officers here saw the front door was closed. They did not knock. Instead, they walked past the side of the house and past a side door, and they entered the private driveway by the backyard. There they encountered the resident, Palomino-Chavez. They seized him and searched him. Then they obtained his involuntary consent to search his property, first in a protective sweep and then in a more thorough search that involved pulling up the floorboards of the shed in the backyard.

The Supreme Court's opinion in *Collins* makes unmistakably clear that a driveway to the rear, more private area of a residence is protected as part of the curtilage even when it is visible from public streets. "The ability to observe inside curtilage from a lawful vantage point is not the same as the right to enter curtilage without a warrant for the purpose of conducting a search to obtain information not otherwise accessible." 138 S. Ct. at 1675. And curtilage is protected from intrusions to search even if there is no physical barrier setting it apart. *Id*. (rejecting proposed bright-line rule based on closed garages, and quoting *United States v. Ross*, 456 U.S. 798, 822

(1982) ("the most frail cottage in the kingdom is absolutely entitled to the same guarantees of privacy as the most majestic mansion")).

The notion that police would be free to enter private driveways and backyards, where uninvited strangers would not be welcome, is a troubling prospect. For purposes of the Fourth Amendment, the critical distinction is between a home's curtilage—the area that harbors the "intimate activity associated with the 'sanctity of a man's home and the privacies of life'"— and what the Supreme Court calls "open fields." *United States v. Dunn*, 480 U.S. 294, 300 (1987), quoting *Oliver v. United States*, 466 U.S. 170, 180 (1984), quoting in turn *Boyd v. United States*, 116 U.S. 616, 630 (1886); see also *Hester v. United States*, 265 U.S. 57, 59 (1924) (Fourth Amendment protection of home did not extend to open fields, and distinction was "as old as the common law"). If we were to treat the backyard and rear driveway of the Palomino-Chavez home as "open fields" rather than curtilage, police would be free to enter and roam many private areas to search for evidence, all without warrants or consent and in the absence of exigent circumstances or hot pursuit. We would be authorizing an extraordinary range of intrusions on private lives and private spaces.

Finally, I disagree with the government's argument that our court's pre-*Collins* precedents authorized the intrusion here, such that the government could rely on *Davis v. United States*, 564 U.S. 229, 238, 241 (2011), which recognized that suppression is not required when police rely on circuit precedent specifically authorizing their actions. To support the officers' intrusion into the rear of Palomino-Chavez's property, the government relies on *United States v. Evans*, 27 F.3d 1219, 1228–29 (7th Cir. 1994); *United States v. French*, 291 F.3d 945, 952–53 (7th Cir. 2002), and *Bleavins v. Bartels*, 422 F.3d 445, 454–55 (7th Cir. 2005), which all took narrow approaches to curtilage. The key language in those cases was narrow and fact-specific, and those cases were all decided before *Jardines* reinforced much broader protections for curtilage. In any event, the *Davis* good-faith defense requires precedent that "specifically authorizes" a particular police practice. 564 U.S. at 241. It does not "excuse mistaken efforts to *extend* controlling precedents." *United States v. Jenkins*, 850 F.3d 912, 920 (7th Cir. 2017).

These considerations provide additional force to Palomino-Chavez's motion to suppress and our reversal of the denial of that motion.