**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Jose Agustin ROMERO–BUS-**
**TAMENTE, Defendant–**
**Appellant.**

**No. 02–10414.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 13, 2003.

Filed July 31, 2003.

Vincent L. Lacsamana, Tucson, AZ, for the defendant-appellant.

Eric J. Markovitch, Assistant United States Attorney, Tucson, AZ, for the plaintiff-appellee.

Before D.W. NELSON, W. FLETCHER, Circuit Judges, and ALSUP,* District Judge.

## OPINION

D.W. NELSON, Senior Circuit Judge.

Appellant José Agustin Romero–Bustamente ("Romero") challenges the district court's denial of his motion to suppress the

---

* The Honorable William H. Alsup, United States District Judge for the Northern District of California, sitting by designation.

discovery of two undocumented Mexican nationals in his backyard in the border town of Nogales, Arizona. Following the denial of the motion to suppress, Romero pled guilty to one count of harboring illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and (B)(i), subject to the condition that he retain his right to appeal the suppression motion. Finding that the motion to suppress should have been granted, we vacate the judgment of conviction and remand with directions to dismiss the indictment.

*FACTUAL AND PROCEDURAL BACKGROUND*

The facts are largely undisputed. Romero lives in a house at 10 Escalada Street in Nogales, Arizona; the property is approximately 10–15 feet north of the border with Mexico. The property is surrounded by, in parts, a brick wall and, in other parts, a wire link fence. There is a space in front of the house, facing the street, and an enclosed backyard behind the house. At the back of the backyard is a shed, and there is a space of about two and half feet between the shed and the fence. The distance from the back door of the house to the shed is approximately twenty feet, and the backyard itself is no more than thirty feet deep.

Beginning on the night of September 17, 2001, Border Patrol employees monitoring video cameras along the border observed several individuals jump the border fence and enter Romero's property. The last sighting was at 7:30 a.m. on September 18, when Sophia Santana observed two individuals jumping the wall into Romero's backyard and going into the shed.[1] Santana immediately called a Border Patrol agent, who searched the area shortly thereafter but found nothing. Later in the day, around 1:00 p.m., Border Patrol

Agent Eric Feldman called Santana and told her that he and others would be working in the area of 10 Escalada Street, and Santana relayed to him what she and others had seen during the night and morning.

Shortly after speaking to Santana, Feldman went to Romero's property along with Agents Rudy Gallegos and Dale Adams. While Adams stayed back and watched the side of the house, Feldman and Gallegos went to the front door and spoke with Romero. The agents asked for permission to search the house for illegal aliens. Romero went back into the house and made a phone call; he apparently talked to a lawyer who had previously represented his daughter. Although there is some conflicting testimony regarding what was then said between Romero and Feldman, it is undisputed that Romero ultimately agreed to allow the agents to search his house.

Although Agents Feldman and Gallegos found nothing in their search of the house, while they were in the house Agent Adams heard a sound coming from the backyard and went around the side of the house to investigate. He searched the backyard and found two men, apparently undocumented Mexican nationals, hiding behind the shed. The agents then arrested Romero.

Romero was indicted on one count of harboring illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). He moved to suppress the discovery of the aliens due to Fourth Amendment violations and to dismiss the indictment. The magistrate judge below denied these motions, finding that the search of the backyard was justified under a statute, 8 U.S.C. § 1357(a)(3). The district court affirmed the magistrate judge's ruling. Romero then pled guilty, subject to the condition that he be allowed

---

1. Although the video recordings are ordinarily saved, the recordings relevant here were apparently destroyed for unknown reasons.

to appeal the suppression ruling. By the time his appeal came before this Court, Romero had already served his one-year prison sentence.

## DISCUSSION

 The only issue before this Court is whether the search of Romero's backyard was valid. Although the parties disagree over whether Romero validly gave consent to search his house, that issue is irrelevant because the search of the house produced no inculpatory evidence and because the Government does not argue that the aliens in the backyard were plainly visible from inside the house or that consent to search the house extended to the backyard. As to the search of the backyard, we review the motion to suppress de novo, and review any factual findings for clear error. *United States v. Garcia*, 997 F.2d 1273, 1279 (9th Cir.1993).

 We begin by noting that the search of the backyard is subject to the Fourth Amendment's privacy protections. Both "the home and its traditional curtilage [are ] given the highest protection against warrantless searches and seizures." *United States v. Warner*, 843 F.2d 401, 405 (9th Cir.1988). The Supreme Court has defined the curtilage as follows:

At common law, the curtilage is the area to which extends the intimate activity associated with the "sanctity of a man's

home and the privacies of life," *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886), and therefore has been considered part of the home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage; and they have defined the curtilage, as did the common law, by reference to the factors that determine whether an individual reasonably may expect that an area immediately adjacent to the home will remain private.

*Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). More recently, in *United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987), the Court clarified that

curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Id.* at 301, 107 S.Ct. 1134. Within the Ninth Circuit, there has been some debate as to whether curtilage determinations should be reviewed for clear error or de novo.[2] Nonetheless, regardless of the standard of review, the undisputed testi-

---

**2.** In *United States v. Johnson*, 256 F.3d 895 (9th Cir.2001) (en banc), a six-judge majority of the en banc panel concluded that the standard of review for curtilage questions should be de novo, purporting to overrule earlier three-judge panel decisions adopting a clear error standard. *Id.* at 898 (per curiam), 913 (opinion of Kozinski, J., joined by Trott, T.G. Nelson, Silverman, Gould, and Paez, JJ.). Nonetheless, a different but slightly overlapping six-judge majority voted to remand the case to the district court for a determination of curtilage in the first instance, *id.* at 898 (per curiam), 901 (opinion of Ferguson, J., joined by Schroeder, C.J., and Pregerson,

Tashima, and Berzon, JJ.), 922 (Paez, J., concurring), prompting one judge to opine that any statement of the standard of review was dicta. *See id.* at 919–21 (Tashima, J., concurring). Although four of the six judges advocating de novo review expressly stated that their statement of the standard of review was not dicta, *id.* at 914 (opinion of Kozinski, J., joined by Trott, T.G. Nelson, and Silverman, JJ.), and another one of the six noted that the panel "should ... resolve the standard of review," *id.* at 922 (Paez, J., concurring), the sixth judge disclaimed any position in the "holding/dicta debate," arguing that the panel could not "bind a future panel which will

mony here establishes that Romero's yard was small, enclosed, adjacent to his house, and located behind his house; under *Dunn*, as a matter of law, the backyard falls within the curtilage.

■ Ordinarily, therefore, any warrantless search of the backyard by governmental agents would be *per se* unreasonable, unless one of the exceptions to the warrant requirement applies. *Warner*, 843 F.2d at 405. The Government does not suggest that Agent Adams's search is covered by any of the traditional justifications for a warrantless search,[3] but instead relies entirely on a statute, 8 U.S.C. § 1357(a)(3), for the proposition that the search was authorized by law. That statute gives Border Patrol agents the power, without warrant, "within a distance of twenty-five miles from any ... external boundary [of the United States] to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." *Id.* The Government argues that the curtilage is not a "dwelling," and therefore falls within the ambit of this statute, which creates an exception to the warrant requirement. Romero contends that the residential curtilage does fall within the definition of a "dwelling," and that the statutory search authority therefore does not apply.

■ "[U]nder familiar principles of constitutional adjudication, our duty is to construe the statute, if possible, in a manner consistent with the Fourth Amendment." *Almeida–Sanchez v. United States*, 413 U.S. 266, 272, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). Thus, if the Fourth Amendment does not allow general warrantless searches of a person's residential curtilage simply by virtue of its proximity to an external border of the United States, we should endeavor to interpret the statute in accordance with the Constitution. But before we reach the question of whether the statute here threatens to "authorize a violation of the Constitution," *id.*, we employ our ordinary tools of statutory construction to determine the meaning of § 1357(a)(3).

Although a few Ninth Circuit cases have interpreted § 1357(a)(3), none governs the precise question presented here. In *United States v. Pacheco–Ruiz*, 549 F.2d 1204 (9th Cir.1976), we considered a search by Border Patrol agents of a "partially excavated space under the house, which could be described either as a crawlspace or as an unfinished basement." *Id.* at 1207. We held that the space was "part of the dwelling, and thus a warrant, or some reason for a search without a warrant, was necessary." *Id.* But although the opinion noted in passing that the "agents had a statutory right to be on [the] land" under § 1357(a)(3), *id.* at 1206, it did not consider whether the statute includes the residential curtilage as part of the definition of "dwellings."[4] The only other Ninth Circuit

have its own duty to assess whether a judicial statement is holding or dicta." *Id.* at 921–22 (Gould, J., concurring). We decline to attempt to resolve this debate herein as it is not necessary to the result in this case.

3. At oral argument, the Government suggested that Agent Adams's search of the backyard might have been necessary for the safety of his fellow agents. As this theory was never advanced prior to oral argument, and is not supported by the district court's factual findings, we will not consider it. *See, e.g., United*

*States v. Reyna–Tapia*, 328 F.3d 1114, 1121 n. 6 (9th Cir.2003) (en banc).

4. Indeed, *Pacheco–Ruiz* was decided before the Supreme Court clarified that the curtilage is to be afforded the protections of the home. In that case, two judges of the Ninth Circuit disputed whether the Fourth Amendment would even reach the crawlspace under the house. *See* 549 F.2d at 1206 (Chambers, J., joined by Choy, J., dissenting from the denial of rehearing en banc). Such a position would be unthinkable today given the Supreme

opinion to interpret § 1357(a)(3) is *United States v. Santa Maria*, 15 F.3d 879 (9th Cir.1994), in which we held that the statute only authorizes searches of private lands when the agents are searching for aliens, but again did not consider the question of whether the statute applies to the curtilage. *Id.* at 881–82.

■ Because no caselaw controls the result, we must engage in the statutory construction exercise ourselves. As with any statute, our starting point is the plain language of § 1357(a)(3); the plain meaning of a statute typically "governs unless that meaning would lead to absurd results." *Reno v. Nat'l Transp. Safety Bd.*, 45 F.3d 1375, 1379 (9th Cir.1995). The common legal meaning of dwelling, as reflected in numerous sources, includes at least two elements: that it be a *structure*, and that it be used as a *residence*. *See, e.g.*, Black's Law Dictionary 505 (6th ed.1990) (defining dwelling as a "house or other structure in which a person or persons live" ·or a "[s]tructure used as place of habitation"); *United States v. McClenton*, 53 F.3d 584, 587 (3d Cir.1995) (adopting the Black's definition); 15 U.S.C. § 1602(v) (Truth in Lending Act) ("The term 'dwelling' means a residential structure or mobile home which contains one to four family housing units, or individual units of condominiums or cooperatives."); 42 U.S.C. § 3602(b) (Fair Housing Act) (" 'Dwelling' means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families. . . ."); 12 C.F.R. § 202.13(a)(2) (Equal Credit Opportunity Act regulation) ("Dwelling means a residential structure that contains one to four units, whether or not that structure is attached to real property. The term includes, but is not limited to, an individual condominium or cooperative unit and a mobile or other manufactured home."); 38 C.F.R. § 36.4501 (relating to loans to Native American veterans) ("Dwelling means a building designed primarily for use as a home, consisting of one residential unit only and not containing any business unit."). Although some authorities would include "[o]utbuildings within the curtilage" as part of a dwelling, *United States v. Eichman*, 756 F.Supp. 143, 148 (S.D.N.Y.1991), there is no common definition of "dwelling" that would extend to an area, such as a yard, that is not a structure. Thus, Romero's yard does not fall within the plain meaning of "dwelling."

Nonetheless, there are good reasons to eschew the plain meaning interpretation here, because it would indeed work an absurd result. Excluding only dwellings, in the most restricted literal sense, from the Border Patrol's warrantless search authority would provide its agents the unchecked ability to enter every backyard in metropolitan San Diego, Detroit, Buffalo, and El Paso, all of which are well within twenty-five miles of external borders of the United States. Aside from the obvious constitutional implications of such an interpretation, we seriously doubt that Congress intended to give the Border Patrol such unique and sweeping powers.

■ "Where, as here, a statute's plain meaning 'produces an absurd, and perhaps unconstitutional, result[, it is] entirely appropriate to consult all public materials, including the background of [the statute] and the legislative history of its adoption.'" *Mattel, Inc. v. MCA Records*, 296 F.3d 894, 905 (9th Cir.2002) (quoting

---

Court's statement in *Oliver* that the curtilage is to be afforded the protections of the home.

*See* 466 U.S. at 180, 104 S.Ct. 1735.

*Green v. Bock Laundry Mach. Co.,* 490 U.S. 504, 527, 109 S.Ct. 1981, 104 L.Ed.2d 557 (1989) (Scalia, J., concurring)) (alteration in original), *cert. denied,* ⸺ U.S. ⸺, 123 S.Ct. 993, 154 L.Ed.2d 912 (2003). We previously used the legislative history of § 1357(a)(3) in *Santa Maria* to note the statute's original purpose:

> Border Patrol authority was extended to private lands within 25 miles of the border because "the activities of the border patrol [had] in certain areas been seriously impaired by the refusal of some property owners along the border to allow patrol officers access to extensive border areas in order to prevent such illegal entries."

15 F.3d at 881 (quoting H.R.Rep. No. 82–1377 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1358, 1360) (alteration in original). This statement suggests that, indeed, Congress did not intend § 1357(a)(3) to authorize searches of individual backyards such as Romero's, which are hardly "extensive border areas."

Another part of the House Report is even more instructive; it states that the statute will not result in an "invasion of the constitutional amendment which guarantees freedom from unreasonable searches and seizures, *since dwellings are not entered without warrant.*" H.R.Rep. No. 82–1377 (1952), *reprinted in* 1952 U.S.C.C.A.N. 1358, 1359 (emphasis added). This statement is more than simply a rephrasing of the text of the statute itself; it is a clear indication that Congress intended, by exempting dwellings from the Border Patrol's warrantless search authority, to honor the traditional Fourth Amendment protections afforded to the home. Congress's intent was only to allow warrantless searches—in other words, searches without probable cause—of areas to which the Fourth Amendment does not reach.

Because the Fourth Amendment's protections do reach the curtilage, we conclude that Congress intended to exempt the residential curtilage from the Border Patrol's warrantless search authority. Put another way, the word "dwelling[ ]" in § 1357(a)(3) has the legal meaning of the word "home," with its concomitant constitutional protections. Because the curtilage is "part of the home itself for Fourth Amendment purposes," *Oliver,* 466 U.S. at 180, 104 S.Ct. 1735, the curtilage is excluded from warrantless searches along with residential structures.

## CONCLUSION

Because the search of Romero's backyard was not authorized by § 1357(a)(3), and because the Government has offered no other basis on which the search might be deemed valid, we conclude that the search violated the Fourth Amendment and REVERSE the district court's ruling on the suppression motion. Because the case against Romero cannot be maintained once the discovery of the aliens is suppressed, we VACATE the judgment of conviction and REMAND for dismissal of the indictment.

**REVERSED** in part, **VACATED** in part, and **REMANDED.**