UNITED STATES of America,
Plaintiff,

v.

Jose E. FERRER-MARTELL,
et al, Defendant.

Crim No. 16-0009 (GAG)

United States District Court,
D. Puerto Rico.

Signed October 25, 2016

Edward G. Veronda, Department of Justice, San Juan, PR, for Plaintiff.

## ORDER

GUSTAVO A. GELPI, United States District Judge

Magistrate Judge Bruce J. McGiverin's Report and Recommendation (Docket No. 60) is hereby **ADOPTED** in its entirety. The undersigned, in a *de novo* manner, has carefully reviewed the same, as well as the suppression hearing transcript (Docket No. 65), the Government's Objection to the Report and Recommendation (Docket No. 67) and Defendant's Response thereto (Docket No. 71). In doing so, I uphold Judge McGiverin's credibility findings, as well as his ultimate conclusion that "under the preponderance of the evidence that [officer] Burgos knowingly and intentionally stated falsely (or at the very least, stated with reckless disregard for the truth) that he received a report from an anonymous tipster." (Report and Recommendation, Docket No. 60 at 14.) More so, I further uphold Judge McGiverin's conclusion that "after excising the tainted evidence, the [search] warrant does not have an independent basis for probable cause and so the evidence discovered inside [defendant's] residence should be suppressed." (Id. at 17.) Because I am affirming Judge McGiverin's factual determinations and conclusions of law, a new evidentiary hearing is unwarranted.

A final and necessary word. This ruling should in no way be interpreted to suggest that the U.S. Attorney's Office is doing a poor job in its firearms and narcotics initiatives. To the contrary. However, a successful prosecution depends not only on the excellent work of the Assistant U.S. Attorney, but also on that of the agent. Inasmuch as federal prosecutions increasingly rely on the actions of local law enforcement personnel, there is thus every more reason to require said officials to act in utmost accordance with federal constitutional standards. This requires the police officer at all times to provide truthful testimony, as well as observe the very mandates of the Fourth Amendment. There is simply no other route.

**SO ORDERED.**

## REPORT AND RECOMMENDATION

BRUCE J. McGIVERIN, United States Magistrate Judge

During the early morning hours of October 30, 2015, agents with the San Juan Municipal Police ("SJMP") scaled an iron gate in front of the residence of Jose E.

Ferrer-Martell ("Ferrer"). The agents then manually opened that gate and tranquilly circled the residence's premises with their flashlights drawn and weapons holstered—all without a warrant. A few hours later, one of the agents requested and received a search warrant from a Puerto Rico state court based largely on what they discovered while in Ferrer's yard. The warrant was executed that same day, and contraband was found inside the residence. Ferrer was later indicted for possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1), and possession of a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). Docket No. 1. Ferrer moved to suppress the evidence discovered at his residence, Docket No. 32, and the government opposed. Docket No. 36. This matter was referred to me for a report and recommendation, Docket No. 49, and an evidentiary hearing was held on July 20, 2016. Docket No. 57.

For the reasons set forth below, the motion to suppress should be **GRANTED**.

## BACKGROUND

At the evidentiary hearing, SJMP Agent Luis Burgos-Nieves ("Burgos"), who prepared a sworn statement in support of the search warrant, was called to testify as to the events on October 29 and 30, 2015. Testimony was also heard from Anthony Toro-Zambrana ("Toro"), an investigator hired by the Federal Public Defender's Office. Ferrer's residence was equipped with indoor and outdoor security cameras, and Toro highlighted various parts of the surveillance videos to discredit the narrative Burgos provided in his sworn statement.

Before delving into Burgos's sworn statement, the hearing testimony, and the evidence, a word about the land's layout is in order: Ferrer's residence is located on Simon Madera Avenue ("Simon Madera"),

specifically, between the streets "Julio Andino" and "Aristides Chavier." Def.'s Ex. D. Simon Madera is a two-way street that permits a driver to travel north or south. *Id.* Julio Andino intersects Simon Madera *south* of Ferrer's residence, and only permits a driver to travel west from this intersection. *Id.* Aristides Chavier intersects Simon Madera *north* of Ferrer's residence, and also only permits a driver to travel west from this intersection. *Id.* A Shell Gas Station is located on the corner of Julio Andino and Simon Madera, and a bar named "Al Paso Senior" is between that Shell Gas Station and Ferrer's residence. Both the Shell Gas Station and the bar are located *south* of Ferrer's residence.

### Burgos's Sworn Statement

Burgos swore that on October 29, 2015, he began his shift at 7:00 p.m., was under the supervision of Sergeant Morales, and planned to "make incursions into the housing projects in the San Juan area, particularly Monte Hatillo and Berwind." Def.'s Ex. A at 1. On that day, Burgos was traveling in a "marked patrol car" with "Agent Ramos," who was sitting in the vehicle's "front passenger" seat. *Id.* Both agents were identified as police officers by their police uniforms. *Id.* At about 1:30 a.m. on October 30, they "were headed to make an incursion into the Ramos Antonini Housing Project, travelling on the Simon Madera Avenue, when [they] were stopped by a gentleman that was coming out of the 'Al Paso Senior' business, which is located on said avenue." *Id.* The gentleman "notified" Burgos that "two persons had jumped the fence of the residence, as he pointed out to [him], with his hands, a residence that is located almost in front of the business." *Id.* The gentleman also stated that "they [were] inside the residence." *Id.*

Burgos approached the residence, which had a "white grill-work gate at the entrance, which was partially open." *Id.* Burgos relayed this information, as well as his location, to his supervisor. *Id.* After doing so, Burgos "proceeded to enter the residence." *Id.* at 1–2. As he was "walking through the area of the yard towards the rear of the residence," he "observed two individuals" whom he could not describe "since due to the time it was very dark." *Id.* at 2. After Burgos yelled "Police," they "took off running and jumped a cement fence in the rear part of the residence." *Id.* At this point, Burgos "immediately noticed" a "peculiar stench" coming from inside the residence. *Id.* Burgos's experience allowed him to identify the "peculiar stench" as marijuana. *Id.* Burgos circled the residence's premises and discovered "five air conditioning consoles," all of which were turned on. *Id.* And with the help of his flashlight, he also discovered "multiple big black plastic planters" with dirt and stalks in the "back part of the dwelling." *Id.* Based on his experience, Burgos identified the stalks inside the planters as marijuana. *Id.*

Burgos also swore that he believed the residence was empty. *Id.* He believed so because "there were no motor vehicles" at the residence and because they "called out and knocked on multiple occasions" but "no one responded." *Id.* At this point, Burgos contacted a canine unit. *Id.* The canine arrived, it "entered quickly," and alerted "from the entrance gate, throughout the entire surrounding area," and near the "back door." *Id.* After the alert, the residence was "put under guard" by four units. *Id.* Once it was morning time, Burgos again circled the residence's perimeter. *Id.* This time he found that the residence did not have "an electric[ity] meter" and that there "was a cable connected from the electrical utility post to the residence." *Id.* In addition, he noticed that the roof had a "vent made out of PVC tube"

and that the windows near the "front part" were broken. *Id.*

### Hearing Testimony & Evidence

Ferrer asserts it is untrue that Burgos received a report from an unidentified pedestrian who chose to remain anonymous out of fear for his own safety (i.e., an "anonymous tipster"). At the hearing, Burgos was asked to describe the manner in which he received the report from the anonymous tipster, was shown a satellite image of the land's layout, and was accurately oriented as to which way was north and south. Def.'s Ex. D. Burgos provided irreconcilable, conflicting versions of the events leading up to the alleged report, and acknowledged that some facts in his sworn statement were inaccurate and untrue.

### The Alleged Report

At the outset, Burgos testified that he was traveling *northbound* on Simon Madera when heading to the Ramos Antonini Housing Project ("Ramos Antonini"), which is located *north* of Ferrer's residence. According to this version, when he was driving "near" the Shell Gas Station and a "little bit further on," he was stopped by a "gentleman" who came out of "a business." That person stopped them by saying "hey officer" and making signaling gestures. After the gentleman provided information to Burgos, he "continued driving *forward*" and "parked at the house the gentleman had told him about." Burgos added that another patrol car was following his vehicle and parked *behind* him.

Burgos was then shown a surveillance video which revealed that his vehicle arrived at Ferrer's residence traveling *southbound*. His patrol vehicle, which was the first to approximate Ferrer's residence, was followed by a second patrol vehicle. Both vehicles approached Ferrer's residence traveling against traffic on Simon Madera, which is a two-way street.

After being shown this video, Burgos changed his story and contradicted his previous testimony: he admitted that he was traveling *southbound* as depicted in the surveillance video. He highlighted, however, that at some point his vehicle can be seen in the video traveling in the direction of the Al Paso Senior bar after he approached Ferrer's residence. In light of this, Burgos claimed that when his patrol vehicle was outside the camera's view, he received information from the gentleman exiting the bar. Afterward, he returned with that information and relayed it to the other patrol vehicle parked in front of Ferrer's residence. During this same time period, however, agents from the patrol car parked in front of Ferrer's residence can be seen outside their vehicles with their flashlights enabled.

Burgos attempted to reconcile his prior testimony, saying that he testified to traveling *northbound* because he indeed was traveling in that direction when he was returning with information from the gentleman. Left unexplained, however, was the reason for his earlier testimony that his vehicle had passed *near* the Shell Gas Station before arriving at Ferrer's residence. Also left unexplained was Burgos's previous testimony that a second patrol car following his vehicle parked *behind* him upon arriving at Ferrer's residence.

After the foregoing testimony, Burgos was given another opportunity to explain his testimony when he was questioned by the government's counsel. This time, Burgos relayed that to arrive at Ramos Antonini, he was going to travel *southbound* on Simon Madera and "cut along Julio Andino" before making another turn that would allow the agents to head *northbound* toward Ramos Antonini. The government's attorney handed Burgos a map and asked him to indicate his planned route on the map. Gov't Ex. 1. Burgos highlighted his planned route on the map, and his mark-ings were inconsistent with the testimony he had provided only moments before. Gov. Ex. 1. Per the highlighted route, Burgos planned to go *southbound* on Simon Madera before making a right turn on Aristides Chavier—not Julio Andino. Afterward, and seemingly unaware of the conflict between his testimony and the route he had just highlighted, Burgos reiterated that he planned to travel *southbound* on Simon Madera before making a right turn on Julio Andino. Burgos was asked why he did not take other routes that appeared to be more efficient, and he testified that he was required to follow the instructions assigned to his patrol car.

After this testimony, Ferrer's counsel made Burgos aware that the route he had highlighted on the map indicated that he would make a right turn on Simon Madera before reaching Ferrer's residence (i.e., a right turn on Aristides Chavier). Burgos retorted that this was the route "they were going to take before the" person stopped them. Instead of making the right turn as planned, however, Burgos continued driving forward (i.e. *southbound* on Simon Madera) because the person outside the bar signaled for them to stop. After this testimony, Burgos provided a different account yet again. Ferrer's counsel asked Burgos whether it was correct that "just before he turned" on *Julio Andino*, he was able to "see all the way to the bar Al Paso Senior" that "somebody was signaling" for him to stop. Burgos unequivocally replied in the affirmative. Burgos was seemingly unaware that if he indeed was traveling *southbound* on Simon Madera *and* saw a person signaling for him to stop "just before he turned" on *Julio Andino*, the person who was allegedly at the Al Paso Senior bar would not be within his line of sight unless he turned around or looked in his patrol car's rearview mirror.

### Other Inaccuracies

Burgos stated in his sworn statement that Agent Ramos was traveling with him while heading to Ramos Antonini. Def.'s Ex. A at 1. Burgos was asked at the hearing, by defense counsel, to identify the person who accompanied him in his patrol car. He unequivocally replied that Agent Quiñones was traveling with him. He later changed this testimony, asserting that Agent Ramos was traveling with him and that Agent Quiñones was on the scene but not inside his patrol vehicle. Burgos attempted to explain the contradictory testimony, saying that he misunderstood the questions posed by Ferrer's counsel. The questions posed by defense counsel on this matter were neither ambiguous nor confusing.

Burgos also swore that the "grill-work gate" in front of Ferrer's residence was "partially open." Def.'s Ex. A at 1. Burgos made clear at the hearing that the gate to which he was referring in his sworn statement was the large gate in front of the residence where vehicles enter the property. One of the surveillance videos reveals that this gate was closed when the agents arrived to the property, that the agents found a way to get inside the property (likely by hopping over the gate),[1] that the agents hovered around the gate's electrical box with their flashlights drawn, and that the agents then manually opened the gate. Toward the end of the hearing, Burgos acknowledged that he was one of the agents who helped open the gate. He attempted to offer an explanation: he swore that the gate was partially opened because it did not have a lock. In assessing the viability of this explanation, it should be noted that Burgos previously told a federal agent during an interview "that the front gate was closed." Docket No. 32–7 at 1 ¶ 5.

Burgos claimed in his sworn statement that there were no vehicles at the residence, that he understood no one was at the residence because they "knocked" and "called out" on "multiple occasions," and that the residence did not have an electricity meter. Def.'s Ex. A at 2. One of the surveillance videos shows that there was a vehicle at the residence. When shown this video, Burgos relayed that he did not think the vehicle was significant. Moreover, Burgos testified that nobody knocked on the residence's door to check if anyone was home. Burgos was also shown a picture of an electricity meter installed at the residence, but he maintained that this electricity meter was not installed at the time he prepared his sworn statement. Def.'s Ex. B-26–27.

Burgos swore that two individuals jumped over a cement fence toward the back of the residence. Def.'s Ex. A at 1–2. As an initial matter, Burgos acknowledged that the fence toward the back of the residence is a chain-link fence, not one made of cement. Def.'s Ex. B-23. Burgos attempted to explain the discrepancy, cryptically saying that he described the fence as made out of cement because the fence itself rests on a cement floor. Burgos also attempted to explain the manner in which the two individuals allegedly jumped over the fence: he claims that he saw the silhouettes of two persons and yelled police, that the two individuals then jumped over the fence, and that he did not chase them out of fear for his own safety. And while Burgos claims that he informed others via the police radio that the persons had jumped over the fence, he readily acknowledged that none of the officers at Ferrer's residence made any effort to pursue the two individuals. Def.'s Ex. C-1.

---

1. While the surveillance video does not capture the agents hopping over the gate, Burgos testified that this was the manner in which the agents entered Ferrer's property.

A surveillance video, which was recorded by a motion-activated camera, captures the moment when the first agent enters the backyard area of Ferrer's residence. It shows an agent calmly walking through the residence's backyard with his flashlight enabled and without his weapon drawn. While the quality of the video is poor, the video does not show two individuals—or the silhouettes of two individuals—running through the backyard or jumping over the fence. And though the surveillance video does show that the officer who first entered the backyard pointed his flashlight momentarily toward the back-fence area, the officer's conduct hardly corroborates Burgos's account. This is so because the officer approaches the fence, points his flashlight toward the back-fence area, and then continues circling the residence.

To be sure, there is a blind spot in one of the cameras which does not permit one to see the property's northernmost wall. This blind spot, for example, prevents the camera from capturing the agents jumping over the gate and going into Ferrer's property. The government's counsel suggested that in determining whether the two people "may or may not have" jumped over the fence to go into Ferrer's residence, it could be "possible" that they "might have gone down the side of the wall and out towards the back" as Burgos stated. But while the blind spot undoubtedly exists, this "possible" account is hardly corroborated by the conduct of the first officer who entered the residence's backyard, as was explained above. And because neither Burgos nor anyone else actually testified to personally seeing the two individuals jump over the fence, the government's suggestion asks the court to assume facts not in evidence and to speculate as to the manner in which the two individuals *might* have entered Ferrer's residence.

Moreover, Toro is a former police officer and testified as to the conduct that could be expected from an officer in such circumstances (i.e., searching for a suspected prowler or burglar in someone's backyard during the nighttime). He testified that an officer in such a situation would normally have his weapon in one hand, his flashlight in the other, and both the flashlight and weapon pointed in the same direction. In light of this, Toro explained, the conduct displayed by the agents who entered Ferrer's residence—who belonged to the SJMP's tactical impact unit—was inconsistent with the conduct one would expect from a police officer in such circumstances.

The surveillance videos do not depict the events that occurred after Burgos and the other agents secured Ferrer's residence because the agents disabled the cameras by manipulating them to point toward the residence. Burgos explained that this action was taken out of a safety concern that someone could observe the officers from, say, a smartphone connected to the cameras. And when the search warrant was executed, the cameras inside the residence were also disabled in a similar fashion for the same reason.

## DISCUSSION

Ferrer and the government reached common ground at the hearing by framing the pivotal issue as whether Burgos truthfully swore that he received the anonymous tipster's report that two people jumped over the fence to go into Ferrer's residence. Ferrer conceded that if Burgos indeed received this report, the agents lawfully entered the curtilage of Ferrer's residence and suppression of the evidence would be unwarranted. And the government conceded that if two people did not jump over the fence or the agents did not believe that this event happened, "the suppression is ripe for the court."

## I. The Fourth Amendment

 The Fourth Amendment protects individuals against unreasonable intrusion by the government, and this "protection stems from the Amendment's instruction that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.'" *United States v. McLellan*, 792 F.3d 200, 208 (1st Cir.), *cert. denied*, —— U.S. ——, 136 S.Ct. 494, 193 L.Ed.2d 360 (2015) (quoting U.S. Const. amend. IV). "At [the Fourth Amendment's] very core stands the right of a [person] to retreat into his [or her] own home and there be free from unreasonable governmental intrusion." *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). "The presumptive protection accorded people at home extends to outdoor areas traditionally known as 'curtilage'—areas that, like the inside of a house, 'harbor[ ] the intimate activity associated with the sanctity of a [person's] home and the privacies of life.'" *United States v. Struckman*, 603 F.3d 731, 738 (9th Cir. 2010) (quoting *United States v. Dunn*, 480 U.S. 294, 300, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) (quotations omitted)).

 It is undisputed that the house searched was Ferrer's residence, and so Ferrer had a reasonable expectation of privacy in the items contained inside that residence. *See, e.g.*, *Silverman*, 365 U.S. at 511, 81 S.Ct. 679. Ferrer also asserts—and the government does not dispute—that the agents entered into the "curtilage" of his residence. Docket Nos. 32, 36. To determine the extent of a residence's "curtilage," four factors are considered: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301, 107 S.Ct. 1134. In this case, Ferrer took steps to enclose the modest area surrounding his residence—which was located in a residential area—by erecting fences and gates that prohibited the entry of unwanted passersby. *Cf. Dunn*, 480 U.S. at 302, 107 S.Ct. 1134 (place searched was not within curtilage of residence where, among other things, it "did not lie within the area surrounding the house that was enclosed by a fence" and the place was a "substantial distance" from the house).

Moreover, the front gates were made of concrete and iron and were maintained closed. Indeed, though Burgos had previously stated that the vehicle gate in front of Ferrer's residence was partially opened, he acknowledged at the hearing that the gate was closed upon the agents' arrival and that the agents opened the gate after they hopped over the fence. In a case presenting similar circumstances, the Ninth Circuit held that the area inside the enclosure was within the residence's curtilage. *See Struckman*, 603 F.3d at 739 ("Struckman's backyard—a small, enclosed yard adjacent to a home in a residential neighborhood—is unquestionably such a 'clearly marked' area 'to which the activity of home life extends,' and so is 'curtilage' subject to Fourth Amendment protection.") (citing *United States v. Romero-Bustamente*, 337 F.3d 1104, 1108 (9th Cir. 2003)). Because Ferrer clearly marked the modest area adjacent to his residence with fences, and because he maintained those fences closed to preserve his expectation of privacy, the court should find that the area surrounding Ferrer's residence was "curtilage" entitled to Fourth Amendment protection.

## II. False Statements & Tainted Evidence

 Government agents may conduct a search of a residence pursuant to a search

warrant, and the sworn statement supporting such a warrant "is presumptively valid." *United States v. Gifford*, 727 F.3d 92, 98 (1st Cir. 2013). However, a "defendant may attempt to rebut this presumption and challenge the veracity of the affidavit." *McLellan*, 792 F.3d at 208. The Supreme Court established the mechanism for doing so in *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). A "defendant must meet a high bar even to get a *Franks* hearing in the first place." *United States v. Tzannos*, 460 F.3d 128, 136 (1st Cir. 2006).

 Once a defendant gets such a hearing, as is the case here, the defendant "must (1) show that the affiant in fact made a false statement knowingly and intentionally, or with reckless disregard for the truth, (2) make this showing by a preponderance of the evidence, and (3) show in addition that 'with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause.'" *Id.* (quoting *Franks*, 438 U.S. at 156, 98 S.Ct. 2674). A similar analysis is conducted "[w]hen reviewing affidavits containing 'tainted' evidence"—the court sets "aside the tainted information and then determine[s] if 'there remains sufficient content in the warrant affidavit to support a finding of probable cause.'" *United States v. Ford*, 22 F.3d 374, 379 (1st Cir. 1994) (quoting *Franks*, 438 U.S. at 172, 98 S.Ct. 2674).

In this case, Ferrer asserts it is untrue that Burgos received a report from the anonymous tipster. In the absence of this report—Ferrer contends—the agents lacked exigent circumstances or a reasonable basis to enter the curtilage of his

residence. It is uncontested that Burgos did not obtain a warrant before entering the curtilage of Ferrer's residence. The government appeared to invoke the exigent circumstances exception at the hearing by saying that the officers would have a right to be inside Ferrer's residence if in fact the police were pursuing two individuals who jumped over the gate.[2]

 Exigent circumstances provide "an exception to the warrant, not the probable cause, requirement." *United States v. D'Andrea*, 648 F.3d 1, 11 (1st Cir. 2011). Accordingly, the First Circuit and others have held that to "cross the threshold" of an area protected by the Fourth Amendment, the government must show that: (1) there was probable cause to believe that a crime or contraband would be found inside, and (2) exigent circumstances permitted the officers to enter without first obtaining a warrant. *See United States v. Wilson*, 36 F.3d 205, 208 (1st Cir. 1994); *Bailey v. Newland*, 263 F.3d 1022, 1032 (9th Cir. 2001) ("It is clearly established Federal law that the warrantless search of a dwelling must be supported by probable cause and the existence of exigent circumstances"); *Struckman*, 603 F.3d at 739 (entry into curtilage of defendant's residence unlawful where police lacked exigent circumstances that permitted the warrantless entry).

### A. Probable Cause

 The government suggests that the agents lawfully entered the curtilage of Ferrer's residence because they reasonably believed that two individuals jumped the fence and were inside Ferrer's resi-

---

**2.** A distinct exception to the warrant requirement—the emergency aid exception—was not invoked by the government to justify the agents' entry into the curtilage of Ferrer's residence. *See United States v. Cervantes*, 219 F.3d 882, 889 (9th Cir. 2000) ("The 'emergen-

cy' exception stems from the police officers' "community caretaking function" and allows them "to respond to emergency situations" that threaten life or limb; this exception does "*not* [derive from] police officers' function as criminal investigators.") (emphasis added).

dence—as was allegedly reported by the anonymous tipster. Implicit in the government's suggestion is the notion that the two individuals were burglars or prowlers. When the police receive such a report from a concerned citizen, they assuredly have "a duty to conduct an investigation into the basis of [a] witness' report." *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991); *see also Struckman*, 603 F.3d at 741 ("the fact that the police officers went to the house in response to Ms. Grimes's 911 report to look around the area and, perhaps, ask questions was consistent with what citizens expect from law enforcement—efforts to assure that they and their property are safe from unlawful, injurious acts by others.").

■ But importantly, in seeking to establish probable cause, "officers may not solely rely on the claim of a citizen witness." *Struckman*, 603 F.3d at 741 (quoting *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001)). Rather, the officers "must independently investigate the basis of the witness' knowledge or interview other witnesses." *Arpin*, 261 F.3d at 925. These rules have cogent rationales: when officers take reasonable steps to corroborate or investigate a single witness's claim, they are less likely to confuse innocuous incidents for criminal conduct, and are less likely to intrude upon someone's reasonable expectation of privacy without having a sufficient basis for doing so. *See Struckman*, 603 F.3d at 741 ("many of us can recount tales about getting locked out of his or her own house, or the house of a relative where one is staying, and having to devise some creative way to get into the house").

■ In this case, even if it is true that Burgos received a report from the anonymous tipster, this report—without more—was insufficient to provide probable cause that a crime was being committed within the premises of Ferrer's residence. *See, e.g., Struckman*, 603 F.3d at 741; *cf. United States v. Singer*, 687 F.2d 1135, 1144 (8th Cir. 1982) (where "a next-door neighbor told" the officer that "there were strangers in the vacant residence" *and* the circumstances the officer observed when he investigated the complaint made it seem "apparent that a burglary was in progress," a warrantless entry was justified), *aff'd on reh'g en banc*, 710 F.2d 431, 432 (8th Cir. 1983). The report allegedly provided in this case was provided anonymously, and Burgos did not ultimately identify the concerned citizen. The alleged report was so thin that Burgos had only one fact he could have corroborated: that two individuals jumped over the fence. Burgos did not testify that he actually observed the two individuals jumping the fence *into* Ferrer's residence, nor did he corroborate any other facts that would suggest individuals jumped over the fence (i.e., footprints on the fence).[3]

The lack of any corroboration—or any other observations by Burgos or other officers—undercuts any the argument that there was probable cause to believe a crime was being committed within the premises of the residence. *See D'Andrea*, 648 F.3d 1, 11 (1st Cir. 2011); *Struckman*, 603 F.3d at 741; *see also Florida v. J.L.*, 529 U.S. 266, 271–72, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (an anonymous telephone tip that a young black male wearing a plaid shirt and standing at a particular bus stop was carrying a gun was, without

---

3. Even if one considered Burgos's sworn statements that no vehicles were at the residence and that the gate was partially opened—which could potentially provide some support for the proposition that some- one entered Ferrer's residence when no one was home—those facts were false: Burgos acknowledged that the gate was in fact closed upon the agents' arrival to the residence and that there *was* a vehicle at the residence.

more, insufficient to establish reasonable suspicion for a *Terry* stop and frisk (let alone probable cause) when the police found the described person with the described clothing at the bus stop).

■■■ Moreover, and more troubling, the evidence at the hearing revealed that Burgos likely did not receive a report from an anonymous tipster. Because Burgos testified to *four* conflicting, irreconcilable accounts of the manner in which he received the report from the anonymous tipster, I find under the preponderance of the evidence that Burgos knowingly and intentionally stated falsely (or, at the very least, stated with reckless disregard for the truth) that he received a report from an anonymous tipster. Given the gravity of this finding, which I recommend to the court, I recount each of the narratives Burgos put forward at the hearing. Burgos first relayed that he traveled *northbound* on Simon Madera, passed *near* the Shell Gas Station located on the corner of Simon Madera and Julio Andino, received the report from the anonymous tipster, proceeded going *forward* until arriving at Ferrer's residence, and parked at Ferrer's residence ahead of the patrol car that shadowed him. After providing this version, Burgos saw a surveillance video depicting his patrol vehicle approaching Ferrer's residence from the opposite direction. This prompted a second narrative.

According to the second version of Burgos's story, his patrol car and the patrol car that shadowed his vehicle were traveling *southbound* on Simon Madera when they arrived to Ferrer's residence. Rather than being stopped by the concerned citizen, however, Burgos claims he drove in the direction of the Al Paso Senior bar to get information from the anonymous tipster. Afterward, he returned with that information and shared it with the other patrol car. After seeing the surveillance video, Burgos no longer claimed that he

was traveling *northbound* on Simon Madera. He did, however, alter his narrative a couple more times. According to the third version of Burgos's story, he was traveling *southbound* on Simon Madera and planned to make a right turn on Aristides Chavier. Gov't Ex. 1. This route is depicted in a map Burgos was asked to highlight. Gov't Ex. 1. Ferrer's counsel informed Burgos that this route had him making a right turn before reaching Ferrer's residence. This right turn would also necessarily occur before Burgos would reach the Al Paso Senior Bar. Burgos acknowledged counsel's statement, and then testified that he did not make the right turn because he saw the anonymous tipster gesturing from the Al Paso Senior bar.

Finally, according to the fourth version of Burgos's story—which is the most implausible of them all—he was driving *southbound* on Simon Madera and saw the anonymous tipster summoning the police "just before" he was about to turn right on *Julio Andino*. For this version to be plausible, Burgos would have been required to look back in order to see the tipster in front of the Al Paso Senior bar. In light of these conflicting accounts, and because the alleged anonymous tipster was not produced for the hearing, the court should find that Burgos knowingly and intentionally stated falsely (or, at the very least, stated with reckless disregard for the truth) that he received a report from an anonymous tipster. Accordingly, the court should also find that there was no probable cause to believe that a crime was being committed within premises of Ferrer's residence.

**B. Exigent Circumstances**

■■■ Exigent circumstances exist "in cases involving [1] hot pursuit ... [2] destruction of evidence ... and [3] threats to public safety ...." *United States v. Baldacchino*, 762 F.2d 170, 176 (1st Cir.

1985) (internal citations omitted). "The government bears the burden of showing specific and articulable facts to justify the finding of exigent circumstances." *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002). The government does not suggest there was a concern that evidence would be destroyed. And as explained above, the preponderance of the evidence adduced at the hearing revealed that Burgos likely did not receive a report from an anonymous tipster, and that he personally did not see two individuals jumping over the fence into Ferrer's residence. This being the case, Burgos was not in pursuit of a suspect when he jumped over the fence into Ferrer's residence.[4] Thus, the court should find that there are insufficient specific and articulable facts to support the government's claim that exigent circumstances existed. In sum, the court should find unlawful the agents' entry into the curtilage of Ferrer's residence because (1) the agents lacked probable cause to believe that a crime was being committed therein, and (2) the government has not demonstrated that exigent circumstances existed when the agents scaled the gate in front of Ferrer's residence.

### III. Suppression

Ferrer asserts that the remaining statements included in Burgos's sworn statement were based on evidence derived from the agents' unlawful entry into the curtilage of his residence. *See Ford*, 22 F.3d at 379 ("[w]hen reviewing affidavits containing 'tainted' evidence": the court sets "aside the tainted information and then determine[s] if 'there remains suffi-

cient content in the warrant affidavit to support a finding of probable cause.'") (quoting *Franks*, 438 U.S. at 172, 98 S.Ct. 2674). Ferrer's assertion was not contested in the government's opposition or at the hearing, and counsel for the government conceded that suppression would be "ripe" if the court found that two individuals did not jump over the fence or the agents did not believe that two individuals had done so.

A review of the statements included in Burgos's sworn statement does not reveal any facts independent of the unlawful entry. Def.'s Ex. A. Instead, in the sworn statement, Burgos merely narrates what he observed after he unlawfully entered the premises of Ferrer's residence. For example, only after the agents had opened the residence's closed gate did the canine "*enter* quickly" into the residence's curtilage to conduct the dog sniff described in Burgos's sworn statement. *Cf. United States v. Beene*, 818 F.3d 157, 162 (5th Cir. 2016) (defendant's driveway—which was open, observable from the street, only partly fenced, and did not have indications that suggested the owners took steps to protect their privacy—was not part of the residence's curtilage and so a dog sniff was permissible in that area). And there was no suggestion—or evidence introduced at the hearing—that the canine alerted from the public sidewalk outside of Ferrer's residence. After excising the tainted evidence, the warrant does not have an independent basis for probable cause and so the evidence discovered inside Ferrer's residence should be suppressed.[5] *See, e.g., Ford*, 22 F.3d at 379.

---

4. In this vein, I note that a surveillance video shows that approximately 10 minutes elapsed between the time the agents arrived at Ferrer's residence and their entry into that residence's backyard. During this time interval, the agents are seen standing outside Ferrer's residence. The government has not presented any evidence that the agents acquired other

facts relevant to the exigent circumstances inquiry while they were outside.

5. The government did not argue that any evidence seized when the search warrant was executed should nonetheless be admitted because the officers acted in good-faith reliance upon the validity of the warrant. *See United*

To be sure, neither *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), nor *Murray v. United States*, 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), compel a different result. In *Segura*, the Supreme Court decided whether "because of an earlier illegal entry, the Fourth Amendment requires suppression of evidence seized later from a private residence pursuant to a valid search warrant which was issued on information obtained by the police before the entry into the residence." *Id.* at 797–98, 104 S.Ct. 3380. The *Segura* Court held that "an illegal entry to secure a premises did not preclude admission of evidence found during a later search of the same location pursuant to a warrant drawn from sources 'wholly unconnected with the [illegal] entry.'" *United States v. Jadlowe*, 628 F.3d 1, 9 (1st Cir. 2010) (quoting *Segura*, 468 U.S. at 814, 104 S.Ct. 3380); *see also United States v. Curry*, 751 F.2d 442, 448 (1st Cir. 1984) ("The evidence secured during the search conducted pursuant to the later-acquired search warrant need not be suppressed, however, because probable cause to search existed even before the illegal entry by the police.").

*Murray* "extended the 'independent source' doctrine to 'evidence that had been observed in plain view at the time of a prior illegal entry.'" *Jadlowe*, 628 F.3d at 9 (quoting *Murray*, 487 U.S. at 535, 108 S.Ct. 2529). After *Murray*, the precise inquiry in such circumstances is "whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue." *Jadlowe*, 628 F.3d at 9 (quoting *Murray*, 487 U.S. at 542, 108 S.Ct. 2529). "That would not be so, the Court explained, 'if the agents' decision to seek the warrant was prompted by what they had seen dur-

ing the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant.'" *Jadlowe*, 628 F.3d at 9 (quoting *Murray*, 487 U.S. at 542, 108 S.Ct. 2529).

■ To implement *Murray*'s holding, the First Circuit has adopted a two-part inquiry. *Jadlowe*, 628 F.3d at 9 (citing *United States v. Dessesaure*, 429 F.3d 359, 367 (1st Cir. 2005)). "In determining whether evidence discovered in a lawful search pursuant to a warrant may be admissible in the aftermath of an unlawful entry," the court considers: "(1) whether the search warrant affidavit contained sufficient information to support probable cause without any information gleaned from the unlawful search; and (2) whether the decision to seek the warrant was in fact independent of the illegal entry, i.e., whether it would have been sought even if what actually happened had not occurred." *Jadlowe*, 628 F.3d at 9 (quoting *Dessesaure*, 429 F.3d at 367–69) (internal quotation marks omitted)).

Here, in the absence of any information gleaned from the unlawful entry into the premises of Ferrer's residence, Burgos's sworn statement does not contain sufficient facts to establish probable cause. This is so because Burgos unlawfully entered the curtilage of Ferrer's residence at night, made observations while circling the perimeter with his flashlight, and discovered most of the facts included in his sworn statement during this time period. And the remaining facts, which Burgos gathered when it was morning time, were also gathered while Burgos was unlawfully inside the premises of Ferrer's residence. Because the facts in Burgos's sworn statement were gathered while he

*States v. Brunette*, 256 F.3d 14, 17 (1st Cir. 2001) (in cases involving search pursuant to invalid warrant, "[t]he government bears the

burden of showing that its officers acted with objective good faith").

 

was intruding upon a reasonable expectation of privacy, the facts therein are not independent of the unlawful entry. *See Horton v. California*, 496 U.S. 128, 135, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) ("What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused."); *Jadlowe*, 628 F.3d at 9.

Moreover, the government did not present evidence which suggested that the facts included in the Burgos's sworn statement were derived from, say, a confidential source or prior investigations conducted by the agents. Accordingly, the court should find that "the decision to seek the warrant" was *not* in fact independent "of the illegal entry" into the curtilage of Ferrer's residence. *Cf. Dessesaure*, 429 F.3d at 370 (suppression not warranted where the "facts gathered legally, without resort to the facts gathered illegally, provided an independent and adequate source for the warrant application"). Thus, the court should suppress the evidence discovered inside Ferrer's residence, as well as the evidence found during the agents' unlawful entry into the curtilage of that residence.

### CONCLUSION

For the foregoing reasons, the motion to suppress should be **GRANTED**.

This report and recommendation is filed pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Davet v. Maccar-*

*one*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson–Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 991 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**